881 A.2d 669

**Michael Jerome BRYANT**

v.

**STATE of Maryland.**

**No. 1154 Sept. Term, 2003.**

Court of Special Appeals of Maryland.

June 1, 2005.

Reconsideration Denied Sept. 21, 2005.

454

Deborah S. Richardson (Stephen E. Harris, Public Defender on the brief), Baltimore, MD, for Appellant.

Annabelle L. Lisic (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, MD, for Appellee.

Panel: HOLLANDER, KRAUSER, CHARLES E. MOYLAN, JR., (Retired, Specially Assigned) JJ.

HOLLANDER, J.

Michael Jerome Bryant, appellant, was convicted by a jury sitting in the Circuit Court for Montgomery County of first degree premeditated murder, felony murder, and first degree burglary. He was sentenced to life imprisonment without the possibility of parole for the first degree premeditated murder conviction and to a concurrent twenty-year term for the burglary conviction.

Appellant presents two questions for our review, which we have reworded slightly:

I. Did the trial court err or abuse its discretion in precluding appellant from presenting an expert witness who would have testified to appellant's psychological profile and its relationship to the *mens rea* of the crimes charged?

II. Did the trial court err or abuse its discretion in allowing the State to introduce into evidence communications that were privileged and irrelevant?

For the reasons set forth below, we shall affirm.

## FACTUAL SUMMARY

On July 20, 2002, appellant's ex-wife, Donna Martin, was fatally stabbed at her townhouse located on Merust Lane in Gaithersburg. The victim sustained numerous stab and cutting wounds, and was pronounced dead soon after she was transported to the hospital.

Appellant and Ms. Martin had two children together, who were three and four years of age at the time of trial in May 2003. Ms. Martin also had a third child with another man;

the baby was approximately six months old at the time of Ms. Martin's death.

The State presented evidence that appellant had threatened Ms. Martin a year before she was killed. Specifically, at a court proceeding held on April 9, 2001, Ms. Martin was speaking to a judge in the presence of appellant. A tape of appellant's comments was admitted in evidence, and showed that he made threatening comments to Ms. Martin at that time.[1] In addition, Cynthia Sargeant, a registered nurse, came into contact with appellant on April 9, 2001, during an intake medical screening at the Montgomery County Detention Center. Sargeant testified: "He [i.e., appellant] indicated that he had a definite plan to kill her. He indicated that he enjoyed seeing her blood. He indicated that he was obsessed with killing her and that she messed with him." Sargeant added that appellant also stated that the "[t]hought of killing her won't go away."

The State also showed that, in the period prior to her death, Ms. Martin sought to conceal her whereabouts from appellant. Dorothy Ann Troup, who lived on Topfield Drive in Gaithersburg, testified that she came to know Ms. Martin through Ms. Martin's mother, who lived in Troup's neighborhood. According to Troup, Ms. Martin and appellant stopped living together shortly before Christmas of 2000, when Ms. Martin moved in with Troup and filed for divorce. Troup claimed that Ms. Martin attempted to conceal her location from appellant. For instance, even when Ms. Martin was not living with Troup, she had her mail sent to Troup's residence. Ms. Martin also used a post office box and Troup took telephone calls for her. At one point, appellant came to Troup's home, but Troup did not tell him that Ms. Martin was living with her.

At the time of Ms. Martin's murder, appellant was required to have supervised visitation with his children, which was coordinated by Betty Wages, who worked for the Family Trauma Service. Wages recalled that, at approximately 9:00

---

1. The tape was not transcribed in the record.

a.m. on July 20, 2002, appellant telephoned her office in Wheaton Plaza concerning a visit he believed had been scheduled for that day. Wages informed appellant that she had been unable to set up visitation for that day. Because appellant was in the area, Wages told him to come to her office and she would call Ms. Martin to set another date for visitation. When appellant entered Wages's office, she was on the telephone with Ms. Martin. Wages described appellant as having "just sort of a flat demeanor." Eventually, a visit was scheduled for the following Saturday at 10:30 a.m. Appellant was in Wages's office for about ten minutes and then left.

Several witnesses from the victim's neighborhood testified that they saw a man, not specifically identified as appellant, near the victim's home on July 20, 2002. For example, Mary Freckleton testified that on July 20, 2002, between 9:00 a.m. and 10:00 a.m., she was visiting her sister, who lived in an apartment on Merust Lane in Gaithersburg, when she looked out the window and noticed a man "walking back and forth." Freckleton, who visited her sister nearly every day, did not recognize the individual as someone who lived in the neighborhood. Later, between 12:00 p.m. and 1:00 p.m., Freckleton again saw the man. Thereafter, between 3:30 p.m and 4:00 p.m., Freckleton saw the man "sitting on the side of the embankment looking down at the apartments[.]"

When asked to describe the man, Freckleton responded:

He was brown skin, short hair. I remember his lips was full. I say he was maybe six, five feet, something and he weighed about 200 and some pounds. He had real short close—short close hair. His hair was cut real close. He was brown skin. . . .

* * *

When I seen him the first time, he had a tee-shirt on. It wasn't—it was not white. If it was white, it was dirty. It was dirty, dirty. It wasn't white. He had . . . I don't if it was jeans. I can't recall if it was blue jeans or black jeans.

Derrick Hall, who was twelve years old at the time of trial and who had lived next door to Ms. Martin, testified that on July 20, 2002, he was playing football with some friends when an African–American man, whom Hall had never seen before, approached them to ask where a woman lived. Hall described the man as "like short" with "a little bit of hair." According to Hall, the man described the lady as "big boned," short, with two children and a baby. Hall pointed to Ms. Martin's residence. Later, after Hall went inside his house, he saw the man "walking around back and forth" behind Ms. Martin's residence.

Tee Martin, who was fifteen years old at the time of trial, testified that he lived on Merust Lane, "two houses over" from Ms. Martin. On the date in question, he arrived home around 2:00 or 3:00 p.m. After arriving home, Mr. Martin's attention was drawn to the back of his townhouse, where he saw an African–American man "pacing." Mr. Martin had never seen the man before and estimated that he walked back and forth about ten times. Later, Mr. Martin heard the sound of shattering glass and, a few minutes after that, he noticed that the police were in the neighborhood.

Loretta Payne testified that, on the date in question, she was staying with her mother, Brenda Cooper, who lived in a townhouse on Merust Lane two houses down from Ms. Martin. Payne recalled that at noon or 1:00 p.m. she was sitting at the kitchen table and "kept seeing somebody walk back and forth behind the houses." Payne stated that she had never seen the man before and described him as African–American, at least 5′8″ tall, with short hair, and wearing a pull over shirt. Payne testified that the man she saw was not the father of Ms. Martin's youngest child.

Stanley Bradley testified that, at 5:00 p.m. on the date in question, he was working with Joseph Hammond, a friend, on Hammond's car, which was parked on Merust Lane. At that time, he noticed a woman with a baby in her arms and a little boy walking toward the door to a townhouse. When the woman was at the door, Bradley heard a bang followed by the

woman "hollering." Upon looking toward the house, Bradley saw the arm of an African–American male grab the woman by the hair and he also "vaguely" saw a knife. The woman yelled: "Somebody help me. He is going to kill me." He saw a man drag the woman, who was still holding the baby, into the house, leaving the boy outside. Bradley also heard yelling coming from inside the house. A woman went to the door and took the child, who had been left outside. The police were called and, when they arrived approximately five minutes later, Bradley related what had occurred.

Kristie Sykes lived on Merust Lane and recalled that she was at the playground with her two children at approximately 5:00 p.m. on the date in question, when she noticed a woman standing beside a car with three children in the car. Sykes watched the woman walk toward her house, then saw "an arm come out and grab her." The woman "ended up in her house" with one of the children, while one child was left outside. Sykes heard screaming coming from the house. Later, Sykes saw a man running. She described him as "a big black male . . . about 5'10", just a little over 200 pounds[.]" He was carrying a 40 ounce bottle of alcohol.

Montgomery County Police Officer Sean Wade responded to Merust Lane for the report of a woman being stabbed. When he arrived on the scene, two other officers were already present, but were unable to enter the townhouse through the front door. Officer Wade ran to the rear of the residence where he found a "broken out rear window." The back door was unlocked so the officer opened the door, stepped inside, and identified himself as a police officer. A small girl approached the officer and he carried her outside and asked where her mother was. The girl pointed at the house. The officer entered the house and found Ms. Martin on the floor in a pool of blood. An infant was found in the house crying and "covered with blood." On the staircase, the officer found a knife.

Captain William Wells, an EMT, responded to Ms. Martin's residence, where he found an infant "covered from head to toe

in blood and ... screaming." The infant had a "large amount of blood" in his nose and mouth.

Ms. Martin sustained multiple stab and cutting wounds. She was flown to Suburban Hospital, where she was pronounced dead. An autopsy performed by Dr. Zabiullah Ali revealed that Ms. Martin received eight stab wounds and nine cutting wounds.[2] Two of the stab wounds injured Ms. Martin's left lung and one of them injured her heart.

From a path through woods near Ms. Martin's townhouse, the police recovered a pair of tan pants with what appeared to be blood on them. Also recovered from the trail in the woods were two latex gloves and a bandana hanging on a branch. The tan pants and latex gloves appeared to have been recently deposited in the woods.

In Ms. Martin's residence, there were two telephones on the ground floor. The cord to one telephone had been cut and the cord for the second phone was missing. From underneath the love seat, a metal sharpening stick, which matched a set of knives found in the house, was recovered. Suspected bloody shoe impressions were found in the floor tiles of the foyer. The police believed that the broken window was the point of entry and found suspected blood on the window. The knife located by Officer Wade was recovered from the stairs and a second knife was found near the front door.

On the morning of July 24, 2002, appellant was arrested in an apartment on North Summit Drive in Gaithersburg. The police found him sitting in a bedroom closet behind a closed door. A wristwatch that appeared to have dried blood on it was recovered from appellant's wrist.

Michael Fontes testified that he had lived in the apartment from which appellant was arrested for approximately five

---

2. Dr. Ali explained:

The difference between [a] stab and cutting wound is the length of the wound. If the length of the wound is shorter than its depth, so if a wound is much deeper than [it] is long, it is called a stab wound. If the length of the wound is longer than it's depth, then it's call[ed] a cutting wound.

years. In July 2002, Fontes had given appellant permission to live there. Fontes stated that he had met appellant a few weeks prior to appellant's arrest. A woman Fontes identified only as "Chocolate" introduced them and appellant asked for a place to stay. Appellant told Fontes that "he was having trouble with his wife, and he was having custody problems." Fontes gave appellant a key to the apartment and he estimated that appellant had been living there one week prior to his arrest.

Fontes recalled that he had returned from a trip the evening before appellant's arrest. After his return, he noticed that, in the bathroom appellant used, "there were cleaning supplies and scouring powder all over the floor, and like 409 on the top of the toilet, and nobody had cleaned the bathroom; it was just all over the bathroom." The police searched Fontes's apartment and, among the items seized, were appellant's shoes, two of his shirts, and a personal bag.

Police Officer Bill Bickle, who testified as a forensic expert in the field of shoe and tire identification analysis, compared the shoe impressions recovered from the foyer of Ms. Martin's residence with appellant's shoes. Officer Bickle explained that there are three levels of conclusiveness in shoe wear examination:

> You have either a positive identification, or you can have an elimination which totally eliminates the known shoe, or you can have what's referred to as a non-conclusion or an inconclusive examination.

> The inconclusive is broken down into three other categories, possibly made, could have made, and highly unlikely that another shoe could have made that based upon the presence of design, shape, and size as well as the random characteristics that were present in that particular shoe.

According to Officer Bickle, two impressions recovered from the scene were positively identified as having been made by appellant's right shoe, and one impression was positively identified as having been made by appellant's left shoe. Regarding two other impressions, the officer opined that it was

highly unlikely that any shoe other than appellant's could have made the impressions. Another two impressions "could have been made" by appellant's shoe.

Charles Heurich, who testified as an expert in forensic biology, stated that Ms. Martin could not be excluded as the source of the blood found on appellant's right shoe, the two knives that were recovered, appellant's shirt, and the pants found in the woods. In addition, Ms. Martin could not be excluded as a major contributor to the DNA profile in the blood found on appellant's watchband, appellant's shirt, the pants recovered from the woods, and appellant's right shoe. The victim was Caucasian and, according to Heurich, the frequency with which Ms. Martin's DNA profile is found in the Caucasian population is one in 52 sextillion.

In addition, appellant could not be excluded as the source of the blood found on the broken rear window and the latch of Ms. Martin's house. Heurich testified that the frequency of appellant's DNA profile in the African–American community is one in 3.3 sextillion.

In the defense case, counsel read the following statement to the jury: "On February 14th of 2002, the defendant made the following statement to a physician, quote: 'I don't have the urge to kill any more like before.'" Appellant did not testify.

In closing argument, defense counsel pointed out that no one had identified appellant as the perpetrator. He told the jury: "[Y]ou're going to have to decide, in your good conscience, who committed this homicide...." He added that, if the jury decided that appellant killed the victim, the jurors would then have to consider the degree of murder.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Prior to trial, defense counsel provided the State with reports from its two experts, Susan Fiester, M.D., and Michael O'Connell, Ph.D. On April 28, 2003, at a motions hearing,

the State informed the court that it had received the reports, but alleged that they were not relevant to any issue before the court. Further, the State argued that the defense had not indicated whether it intended to "present psychiatric testimony that ... relates to the ability of the defendant to form the necessary intent or premeditation for a particular crime."

Appellant's attorney responded that the defense experts would testify that Bryant suffers from an impulse control disorder. According to defense counsel, that testimony was relevant to the element of premeditation.

The prosecutor countered:

If the defendant has an impulse control disorder, and if that's what their opinion is, the problem with it, as I read the letters, he hasn't admitted he did the crime. Therefore, what is the relevance of someone having an impulse control disorder unless they're going to say, well, I was the one who met her at the door, and I'm the one who murdered her in front of her three children.

And if they're going to say it was because of this impulse control disorder he did it, and it was that psychological profile that in some way affects his ability to premeditate to intent, that's fine.

Defense counsel alleged that the impulse control disorder "is relevant because it is probative of whether he had [the required] mental state in existence at that time. It makes the existence of that mental state more or less likely, so it's relevant."

Thereafter, the State filed a motion *in limine* to exclude the proposed testimony of the defense expert witnesses. The State alleged that the experts' reports do "not go beyond an attempt to generally inject vague references to a laundry list of potential psychiatric conditions none of which rise to the level of negating the defendant's competency or responsibility." The State continued: "Without an acknowledgment by the defendant that he was in fact responsible for Ms. Martin's killing, allowing a psychiatric portrait of the defendant to

explain his mental state at the time of the crime would be meaningless, irrelevant, and confuse the jury."

On May 12, 2003, the court held a hearing on the motion, at which the State argued: "The defendant has not raised ... any issue relative to competency or criminal responsibility. It is the State's position that nothing in these reports in light of that would be admissible substantively at trial." In its view, the "laundry list of various psychiatric conditions" referenced in the reports should only be considered at sentencing. Further, the State reiterated: "[T]here is no nexus between the information or the psychiatric conditions that are alluded to by these doctors and the conduct of the defendant on July 20th of last year when he ended the life of Donna Martin, because he's never admitted he did the crime, and specifically denies that he did the crime."

Defense counsel responded that the State had to prove appellant's *mens rea* and that the defense could challenge that with the reports, without confessing to the crime. Defense counsel continued:

He [i.e., appellant] has impulse control problems. Now, that's relevant because the State is making it relevant, because they're saying ... he didn't just kill Donna Martin, he deliberated about it, he considered it and he premeditated it.

And what we're saying is, jury, when you deliberate about this, you should have the evidence that is relevant to the mental issues that the State has put into play. One of those is what the defendant's psychological profile is, as evidenced by O'Connell's report.

The fact that the defendant hasn't confessed to O'Connell I just don't [think] is relevant, and I don't think the defendant should be forced to have to take the stand to confess to a crime to be able to introduce a defense, or to challenge the State's burden of beyond a reasonable doubt on the mens rea that they have to establish for a first-degree murder.

The trial court stated: "We'll see what happens at trial. If they [the defense] can't lay a better foundation, well, there may be some problems. We'll see."

At the close of the State's case, the court revisited the issue of the admissibility of the defense's expert witnesses. The State argued:

They keep talking about this impulsive psychiatric profile that he has. But there is a huge missing piece in between. There is no evidence before the trier of fact here that this crime occurred as the result of an impulsive act of the Defendant.

The evidence seems to show quite the contrary. It's a long premeditated act. Even on the day in question, there were hours in which this event took place. The Defendant, in his conversations with his two doctors, appeared to have denied his involvement in the crime. There is no indication in the reports that he has admitted to a crime. What is the possible scenario within which their testimony relative to his ability to form premeditation or intent is relevant if there is no factual scenario that is in evidence to which that testimony is relevant?

Appellant's attorney asserted that he sought to offer evidence of appellant's psychological profile, including evidence about his impulse control disorder, to explain the two statements from 2001, which the State sought to attribute to appellant, and to address the element of premeditation. Further, he argued that the State put in issue the matters of premeditation and appellant's mental state, which the defense was entitled to rebut.

Before ruling, the trial court agreed to hear the defense expert testimony outside of the presence of the jury. Dr. Fiester was then received as an expert in the field of forensic psychiatry.

The defense asked Dr. Fiester whether she had formed any diagnostic conclusions about appellant. She responded:

He reported symptoms of a conduct disorder during his adolescence. He reported psychotic symptoms including some paranoia and mildly delusional thinking.

He had symptoms of impulse control disorder, symptoms of a major depressive disorder, a life-long history of dysthymia, which is a disorder which involves chronic low level depressive symptoms that are intermittent over the course of years. That dysthymia had its onset during his early years, probably adolescence.

He also reported symptoms of panic attack since the age of 21 and some symptoms of post traumatic stress disorder. I also felt, although it can't be a definitive diagnosis because of the presence of the other major disorders that he had some traits of borderline personality disorder.

Defense counsel also questioned Dr. Fiester about appellant's impulse control disorder. The following colloquy is pertinent:

[DEFENSE COUNSEL]: In terms of the impulse control disorder, could you explain what that is to the Court as it relates to Mr. Bryant?

[DR. FIESTER]: Impulse control disorder, yes. Again, I'd like to be able to [refer] to the DSM–IVTR, which is the really gold standard diagnostic manual for the psychiatric disorders. An impulse control disorder is a disorder which has an essential feature which involves the occurrence of discrete episodes of a failure to control or resist aggressive impulses.

That failure can result in serious assaultive acts towards persons or property. The other important aspect of that is that the aggressiveness expressed is gross[ly] out of proportion to provocation or the precipitating factors. So, if you look at a situation, you might wonder why an individual was reacting that profoundly and aggressively to a particular situation.

[DEFENSE COUNSEL]: When you talk about an impulse control disorder, could you explain how that is relevant to

any allegation that there is planning [of] activities, or deliberations, or consideration, or premeditation of a violent act? [DR. FIESTER]: Yes. It's directly relevant because in that type of situation ... it may be a sort of unpredictable situation that precipitates this kind of reaction. The individual really is not able to control their behavior.

In fact, that's part of the definition of an impulse control disorder in the diagnostic manual. It is described actually, the description of the disorder as intense impulses to be aggressive prior to the aggressive acts.

It may be associated with affective symptoms such as rage, increased energy, racing thoughts, and also some physical symptoms. There are symptoms somewhat similar to panic type symptoms, palpitations, chest tightness, hearing an echo, pressure in your head. Then the individual essentially explodes. That's essentially what the disorder involves.

[DEFENSE COUNSEL]: Is it a fair statement that not all individuals are equally capable of forming and possessing the same types and degrees of intent to commit a violent act?

[DR. FIESTER]: You know, that is correct, yes. In addition, the ability to have that intent and the ability to control one's behavior can vary from moment-to-moment, day-to-day, month-to-month, or year-to-year in any given individual, even with a baseline set of personality or psychiatric symptoms.

[DEFENSE COUNSEL]: So, if I understand your testimony, in determining the nature of, say, for example Mr. Bryant's intent, it is very relevant to consider whether he has this impulse control—

[PROSECUTOR]: I object. That's leading. I mean, who is testifying here?

THE COURT: Sustained.

[DEFENSE COUNSEL]: Is it relevant to consider impulse control disorder in determining Mr. Bryant's intent to commit a particular violent act?

[DR. FIESTER]: Yes.

[DEFENSE COUNSEL]: If you could, again, just explain that for the Court.

[DR. FIESTER]: Again, it is a failure to contain what can be overwhelming, immediate aggressive impulses.

[DEFENSE COUNSEL]: Have you had an opportunity to view any of the charging documents in this case?

[DR. FIESTER]: I've viewed some of the Police documents. Certainly, by no means have I seen them all.

[DEFENSE COUNSEL]: What police documents did you review?

[DR. FIESTER]: I have the pre-sentence investigation, the event report.

[DEFENSE COUNSEL]: The event report. The event report was for the incident that occurred on July 20, 2002.

[DR. FIESTER]: Let me just verify that.

(Pause.)

Yes, 07/20/02. I have other documents as well. I believe there are several renditions. There might be several renditions of that. I guess I have a media report. There are several event reports, I believe, by different people.

[DEFENSE COUNSEL]: Is there a connection or a nexus between an impulse control disorder of the type that you have determined that Mr. Bryant suffers from and the allegations that you have reviewed in the statement of events or summary of events?

[DR. FIESTER]: Yes.

[DEFENSE COUNSEL]: What is that?

[DR. FIESTER]: That my understanding is that Mr. Bryant has been charged with murder, essentially, and that the nexus between the two is that an impulse control disorder can lead an individual in certain circumstances to experience overwhelming aggressive urges that could result in them acting out those urges, and could result in an assaultive act.

[DEFENSE COUNSEL]: Again, when you're saying "impulsive," when I think of impulsive, that means sudden, spontaneous, without planning, and deliberation. Is that an accurate way to define impulse?

[DR. FIESTER]: Yes.

\* \* \*

[DEFENSE COUNSEL]: Dr. Fiester, the question is, if the Defendant is in a Court proceeding and there is a voice speaking, and the Defendant appears agitated by that voice, and then interrupts that voice, and then has a verbal outburst and makes threats, is that evidence of an impulse control disorder?

\* \* \*

[DR. FIESTER]:.... I can say yes, that information is consistent with an impulse control disorder. In fact, if you look at the associated features of the disorder as described in the DSM–IVTR, it says that signs of general impulsivity or aggression may be present between explosive episodes.

Let's not forget the impulse control disorder means physically assaultive acts. So, it says that individuals with this disorder may report problems with chronic anger and frequent sub-threshold episodes. In other words, they don't lose it and attack someone, but they experience aggressive impulses, but either manage to resist acting on them or engage in less destructive aggressive behavior, such as screaming, punching a wall without damaging it, et cetera.

So, a verbal tirade instead of actually acting out the aggressive impulse by beating someone up or harming them seriously is completely consistent with the features of this intermittent explosive disorder.

During cross-examination, the following occurred:

[PROSECUTOR]: My question is you testified earlier that intermittent explosive disorder from month-to-month or from day-to-day it in fact can be different, isn't that true, in terms of its impact on an individual? Just because you

diagnose someone with impulse disorder or intermittent impulse disorder, the effect of that disorder can be different from day-to-day or month-to-month, to use your words. Isn't that correct?

[DR. FIESTER]: No. I believe that's not quite accurate. I said that each state of the individual and their degree to which they can resist an impulse, aggressive impulse can vary from time-to-time, but the key core characteristic of the disorder is having episodes where you are unable to resist that aggressive episode.

[PROSECUTOR]: So, the effect of the disorder does vary from day-to-day. The effect of the disorder varies from day-to-day and month-to-month by degree. Is that what you're saying?

[DR. FIESTER]: I'm not exactly sure I would say it is the effect of the disorder.... The disorder is present all the time, but the ability of the individual to resist those impulses can vary.

Following the State's cross-examination of Dr. Fiester, the trial court inquired:

THE COURT: You are not saying, are you, that every person or even this person who has impulse control disorder isn't capable of controlling his actions, are you?

THE WITNESS: At all points in time, no. That's correct.

THE COURT: So, anyone with this disorder is capable of planning a future action. Is that correct?

THE WITNESS: Yes. Just the presence of the disorder itself, without further information, would [lead] me to say that it's possible an individual that carries this diagnosis could plan a crime.

Questioning by defense counsel and the State continued, followed by argument from counsel. Ultimately, the trial court declined to admit Dr. Fiester's testimony and commented. It ruled:

I am holding that [Dr. Fiester's] testimony is not competent and is not relevant to this case. There is no evidence

that there was an absence of a particular mental element of the crimes charged in this case. At the most, we have testimony from Dr. Fiester that the defendant suffers from impulse control disorder, which affects him from time-to-time.

Whether that disorder affected him at the time of the crimes committed here would be completely speculative. This testimony would not assist the jury, but would rather confuse them.

■ Appellant contends that the trial court erred in failing to admit Dr. Fiester's testimony. He maintains that the testimony was "directly relevant to the issue of premeditation." Moreover, he asserts: "This error precluded Appellant from presenting any defense and reversal is clearly warranted."

Bryant explains that the doctor's testimony would make it "more probable" that the crimes were not the result of premeditation, because he was suffering from an impulse control disorder at the time of the murder. Moreover, he contends that "the factual predicate" for the testimony was established "in the State's own case." Therefore, he insists that his own "testimony was not required to establish the relevancy of his psychological profile testimony."

Further, appellant claims that the doctor's testimony was relevant in light of Sargeant's testimony about appellant's comments during the routine medical screening at the Detention Center. Additionally, appellant contends that the testimony was relevant because "it was never established at trial that the individual seen in [Ms. Martin's] neighborhood was in fact Appellant." As a result, the jury might have believed, as argued by defense counsel in closing argument, that appellant was not agitated when he left the visitation coordinator's office, which "opens the possibility that the acts were impulsive and not premeditated."

Moreover, while recognizing the discretion of the trial judge in regard to "psychological profile evidence," Bryant notes that the discretion is not "unfettered." He asserts: "The

right of a defendant to call witnesses in his behalf is protected by both the confrontation clause and the due process clause of the federal constitution." In his view,

the exercise of the judge's discretion effectively denied Appellant his right to present a defense. In fact, the entire theory of the defense and cross examination of witnesses was tailored to present a defense of mitigation, as opposed to denial. This was made clear even by the defense closing, which spent a *de minimis* amount of time on denial.

The State responds: "Contrary to Bryant's argument, the trial court, after hearing the argument of counsel and testimony of one of the experts outside the presence of the jury, correctly determined that the testimony was irrelevant, speculative, confusing, and of no assistance to the jury."

Maryland Rule 5–702 provides for the admissibility of expert testimony. It states:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

The admissibility of expert testimony is committed to the sound discretion of the trial court. *Wilson v. State,* 370 Md. 191, 200, 803 A.2d 1034 (2002); *Deese v. State,* 367 Md. 293, 302, 786 A.2d 751 (2001). The court's action in admitting or excluding such testimony seldom constitutes ground for reversal. *Id.* at 302–03, 786 A.2d 751; *Oken v. State,* 327 Md. 628, 659, 612 A.2d 258 (1992), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *Diaz v. State,* 129 Md. App. 51, 75, 740 A.2d 81 (1999), *cert. denied,* 357 Md. 482, 745 A.2d 436 (2000); *Vandegrift v. State,* 82 Md.App. 617, 634, 573 A.2d 56, *cert. denied,* 320 Md. 801, 580 A.2d 219 (1990).

Despite the broad discretion vested in a trial court, however, the " 'decision to admit or reject [expert testimony] is reviewable on appeal and may be reversed if it is founded on an error of law or if the trial court clearly abused its discretion.' " *White v. State,* 142 Md.App. 535, 544, 790 A.2d 754 (2002) (quoting *Cook v. State,* 84 Md.App. 122, 138, 578 A.2d 283 (1990), *cert. denied,* 321 Md. 502, 583 A.2d 276 (1991)) (alteration added in *White*).

■■ Expert testimony is admissible only if it is relevant in a particular case. *State v. Smullen,* 380 Md. 233, 268, 844 A.2d 429 (2004). "Whether an expert witness's testimony is relevant depends on whether the jury will find the testimony helpful in resolving the issues in the case." *Wise v. State,* 132 Md.App. 127, 135–36, 751 A.2d 24, *cert. denied,* 360 Md. 276, 757 A.2d 811 (2000); *see Smullen,* 380 Md. at 268–69, 844 A.2d 429. In *Sippio v. State,* 350 Md. 633, 714 A.2d 864 (1998), the Court of Appeals explained:

> According to Md. Rule 5–702, which codified the modern common-law rule regarding expert testimony, a trial court must determine whether the evidence to be presented is a proper subject of expert testimony. The inquiry turns on whether the trier of fact will receive appreciable help from the expert testimony in order to understand the evidence or to determine a fact in issue. The trial court need not consider whether the trier of fact could possibly decide the issue without the expert testimony. Nor must the subject of the expert testimony be so far beyond the level of skill and comprehension of the average layperson that the trier of fact would have no understanding of the subject matter without the expert's testimony.
>
> In ascertaining whether expert testimony will be helpful to the trier of fact, a trial court must instead determine whether certain requirements have been satisfied: (1) the proposed witness must be qualified to testify as an expert; (2) the subject matter about which the witness will testify must be appropriate for expert testimony; and (3) there

must be a legally sufficient factual basis to support the expert's testimony.

*Id.* at 649, 714 A.2d 864 (internal citations omitted).

Here, appellant sought to admit expert testimony concerning the relationship of appellant's mental disorder to the *mens rea* of premeditation. The Court of Appeals has said:

[E]vidence demonstrating a lack of *mens rea* serves a different purpose from evidence demonstrating that the defendant was insane at the time of the crime and hence not criminally responsible. The first type of evidence is offered to negate an indispensable element of the crime and bears on culpability (i.e., guilt or innocence). The second type is offered to establish insanity and impacts not upon culpability but rather upon the appropriateness *vel non* of criminal punishment.

\* \* \*

[W]here a particular mental element of a crime must be proved to establish the commission of a crime, evidence that it did not exist, whether due to mental impairment or some other reason relevant to that issue, is admissible.

*Hoey v. State*, 311 Md. 473, 494, 495, 536 A.2d 622 (1988).

*Hoey* was followed by *Simmons v. State*, 313 Md. 33, 542 A.2d 1258 (1988). In that case, the Court also addressed the admissibility of such expert testimony.

Simmons was accused of murder and raised the defense of imperfect self-defense. *Id.* at 35, 542 A.2d 1258. At trial, Simmons sought the admission of expert testimony concerning his state of mind at the time of the offense. He proffered that he would testify that, at the time of the homicide, he believed that the use of force was necessary to prevent imminent death or serious bodily injury. The defense's expert, a psychiatrist, would then testify that her examination of Simmons revealed that he did, in fact, have such a subjective belief. *Id.* at 36, 542 A.2d 1258. The trial court ruled that the expert's testimony would usurp the jury's function. *Id.*

Simmons then made a second proffer. He claimed that the psychiatrist would testify only that the defendant's subjective belief would be consistent with his psychiatric profile. The trial court would not allow testimony as to Simmons's thought processes at the time of the homicide. *Id.* Ultimately, Simmons never called the psychiatrist as a witness, and was convicted of second degree murder.

The Court of Appeals held that the trial court's ruling was "too broad." *Id.* at 41, 542 A.2d 1258. The Court commented: "As we see it, the proffered testimony tended to prove an element of imperfect self-defense...." *Id.* at 39, 542 A.2d 1258. The Court added: "In light of *Hoey v. State,* Simmons is permitted to present evidence of his mental state in support of his defense of imperfect self-defense." *Id.* at 39 n. 3, 542 A.2d 1258. Concluding that psychiatric evidence that was limited to the psychological profile of the defendant was admissible, *id.* at 46, 542 A.2d 1258, the Court said:

> [T]he proffered testimony has some relevance in that consistency between the specific subjective belief testified to by Simmons and Simmons's psychological profile tends to make it more likely that Simmons in fact held that subjective belief.... Here the judge did not purport to exclude the evidence by the exercise of discretion so that no issue of discretion is before us. The judge erroneously ruled, as a matter of law, that the evidence could not, under any circumstances, be admitted.
>
> As the evidence sought to be admitted may have been sufficient to convince the jury that the defendant, if guilty, was guilty of a crime less than murder, its exclusion constitutes reversible error. Accordingly, Simmons must be granted a new trial.

*Simmons,* 313 Md. at 48, 542 A.2d 1258 (citation omitted).

*White, supra,* 142 Md.App. 535, 790 A.2d 754, is also illuminating. Writing for this Court, Judge Adkins addressed the lessons of *Simmons:*

> *Simmons* established two categories of psychiatric expert testimony, one which is inadmissible as a matter of law, and

one which is admissible at the discretion of the trial court. The first category of testimony, under which the expert testifies that the defendant was *in fact* suffering from a specific psychiatric disorder on the date in question, is inadmissible as a matter of law because it usurps the jury's function and because a psychiatrist "cannot precisely reconstruct the emotions of a person at a specific time." [*Simmons*, 313 Md. at 48, 542 A.2d 1258]. In the trial court's discretion, however, an expert may testify as to a defendant's psychiatric profile, from which the jury might *infer* that the defendant was suffering from the symptoms of that psychiatric disorder on the date in question. "[T]he proffered [expert] testimony has some relevance in that consistency between the specific subjective belief testified to by [the defendant] and [the defendant's] psychological profile tends to make it more likely that [the defendant] in fact held that subjective belief." *Id.*

*Id.* at 545, 790 A.2d 754 (emphasis and alterations added in *White*).

We are also guided by *Hartless v. State*, 327 Md. 558, 611 A.2d 581 (1992). In that case, the trial court declined to admit expert testimony with regard to Hartless's state of mind at the time of the offense. *Id.* at 560–61, 611 A.2d 581. After the trial court so ruled, Hartless argued that the psychiatrist should be permitted to testify to his psychological profile, claiming that such testimony was admissible under *Simmons*. *Id.* at 574, 611 A.2d 581. The defense proffered that the profile would include: "That the defendant was under a tremendous amount of stress from his father and the background of the defendant in relating to that. . . ." *Id.* at 575, 611 A.2d 581. During discussions with the prosecutor and defense counsel, the trial court insisted that, in order for the psychological profile to be admissible, it must have more relevance than merely " 'narrating the social history of the defendant.' " *Id.* at 576, 611 A.2d 581 (citation omitted). The trial court excluded the psychiatrist's testimony because it lacked an adequate factual basis and was not relevant to a material issue in the case. *Id.* at 575, 611 A.2d 581.

Concluding that the psychiatrist's testimony was properly excluded with respect to state of mind, the Court reasoned:

[P]sychiatrists have not been shown to have the ability to precisely reconstruct the emotions of a person at a specific time, and thus ordinarily are not competent to express an opinion as to the belief or intent which a person in fact harbored at a particular time.

*Id.* at 573, 611 A.2d 581 (citations omitted).

The Court of Appeals also determined that the trial court did not abuse its discretion with respect to the ruling pertaining to psychological profile. It reasoned:

We hold that the exclusion of [the expert witness's] psychological profile testimony did not amount to a clear abuse of discretion by the trial court. The record reflects that the court did not believe the psychological profile testimony was relevant to any issues in the case or to any defense generated by the defendant, or would be of appreciable help to the jury. This holding does not appear to be clearly in error, and we disagree with Hartless that it is inconsistent with our decision in *Simmons*. As already mentioned, in *Simmons* we found the psychological profile testimony to have relevance because the defense had proffered that the testimony would come after the defendant had first testified to his mental state at the time of the crime, and the profile testimony would support the imperfect self-defense claim proffered by the defendant:

[T]he proffered testimony has some relevance in that consistency between the specific subjective belief testified to by Simmons and Simmons's psychological profile tends to make it more likely that Simmons in fact held that subjective belief.

*Hartless,* 327 Md. at 577, 611 A.2d 581 (quoting *Simmons, supra,* 313 Md. at 48, 542 A.2d 1258).

In the *Hartless* case, the psychological testimony, standing alone, "had little or no rational nexus to the issues of premeditation and intent." *Id.* It was thus unclear how a jury could have found the profile helpful in resolving those issues. The Court explained, *id.:*

The absence of a nexus between a psychological profile of the defendant that [the expert] might have been able to relate and the issues before the jury resulted, at least in part, from the absence of an adequate evidentiary foundation. As the trial judge noted, the defendant failed to produce admissible evidence of some facts that [the psychiatrist] wished to rely on in determining the defendant's psychological background, and failed to produce evidence of particular facts relating to the occurrence of the criminal event, *i.e.*, the defendant's version of what happened, that were essential, not only to the formation of the expert's opinion but to the relevance of that opinion to the issues in the case.

*State v. Smullen, supra,* 380 Md. 233, 844 A.2d 429, is also instructive. In that case, the defendant, a teenager, was accused of murdering his adoptive father. *Id.* at 238, 844 A.2d 429. Claiming he had been abused by his father, the defendant asserted that he acted in self-defense, and sought to rely on the Battered Child Syndrome. *Id.* However, the trial court refused to allow him to present expert psychiatric evidence concerning the syndrome. Moreover, concluding that the issue of self-defense was not generated by the facts, the trial court refused to instruct the jury as to self-defense. *Id.*

On appeal, the Court of Appeals unanimously held that Battered Spouse Syndrome, as recognized in C.J. § 10–916, "applies as well to battered children." *Id.* at 268, 844 A.2d 429. However, a divided Court concluded that the defense was not relevant, because the issue of self-defense had not been "sufficiently generated . . ." by the facts. *Id.* at 269, 844 A.2d 429. Among other things, the majority observed that "the *objective* evidence demonstrated a classic first degree premeditated murder." *Id.* at 271, 844 A.2d 429 (emphasis in original). Moreover, it pointed out that "[t]here was no evidence . . . of the kind of repetitive cycle of violence that lies at the heart of [battered child] syndrome." *Id.* The Court reasoned, *id.* at 273–74, 844 A.2d 429:

When a defendant claiming self-defense offers foundational evidence which, if believed, would establish the requisite

pattern of abuse sufficient to provide a base for an expert opinion as to the battered spouse/child syndrome, it should be admitted, so that it can be followed by the expert testimony. The syndrome evidence would then play its proper role in explaining why and how, in light of that pattern of abuse, the defendant could honestly, and perhaps reasonably, perceive an imminent threat of immediate danger. To permit that kind of evidence in a case such as this, however, would detach the syndrome from its proper mooring and allow the jury to find that random and undefined acts of abuse perpetrated at undefined times in the past, none of which apparently caused serious physical injury, or required any medical attention, or attracted the notice of anyone in a position to notice them, can reduce a classic premeditated murder to manslaughter or acquittal. If used in that setting, the syndrome would, indeed, constitute an independent defense and assume a significance unsupported by the psychological pillars upon which it properly rests. We recognize the doctrine, but there was no evidentiary basis for it in this case.[1]

*See also CSX Transp., Inc. v. Miller,* 159 Md.App. 123, 201, 858 A.2d 1025 (2004) (recognizing that, with respect to expert testimony, "the focus ... is, properly, on the broad discretion entrusted to trial judges on evidentiary rulings"), *cert. granted,* 384 Md. 581, 865 A.2d 589 (2005); *Wood v. Toyota Motor Corp.,* 134 Md.App. 512, 523, 760 A.2d 315 (observing, in a product liability case, that "[i]t is well settled that the trial judge ... determines whether there exists an adequate factual basis for the opinion in issue," and concluding that the trial court did not abuse its discretion and was not "clearly erroneous in finding that [the expert's] opinion was based on an incomplete factual predicate").

We acknowledge that a defendant in a criminal case is not barred, as a matter of law, "from advancing ... inconsistent theories" of defense. Joseph F. Murphy, Jr., MARYLAND EVIDENCE HANDBOOK, § 403(a), at 118 (3rd ed. 1993) ("Murphy"). On the other hand, a "defendant charged with murder does

not get an alibi instruction if he acknowledges being at the scene of the crime," nor does a defendant accused of selling drugs "get an entrapment instruction if he denies having committed the crime." *Id.* At least "some evidence" must be offered by the defendant to generate a defense. *See Smullen,* 380 Md. at 274 n. 14, 844 A.2d 429; *Roach v. State,* 358 Md. 418, 428, 749 A.2d 787 (2000); *Dishman v. State,* 352 Md. 279, 292–94, 721 A.2d 699 (1998); *Dykes v. State,* 319 Md. 206, 215–17, 571 A.2d 1251 (1990).

*Sims v. State,* 319 Md. 540, 550, 573 A.2d 1317 (1990), is relevant. In that case, the defendant shot the victim and was convicted of second degree murder. On appeal, he claimed the trial court erred in refusing to instruct the jury on voluntary manslaughter, on the ground that the evidence "fairly generated the question of whether the shooter, 1) acted in hot-blooded response to legally adequate provocation or, 2) was entitled to claim imperfect self-defense." *Id.* at 543, 573 A.2d 1317. The Court of Appeals found "no fault with the defendant's attempt to interpose inconsistent theories of defense and mitigation," *id.,* but held that the evidence was insufficient to warrant a manslaughter instruction. *Id.; see id.* at 548, 573 A.2d 1317.

In *Sims,* the defendant testified in his own defense. He argued that the jury was entitled to consider his "subjective state of mind," despite the lack of any evidence concerning the beliefs of the assailant. *Id.* at 554, 573 A.2d 1317. What the Court said is noteworthy here:

> As we pointed out above, the defendant has the burden of presenting some evidence sufficient to reasonably generate the issue. The issue in this instance involved the honestly held subjective feelings of the perpetrator at the moment of the shooting. *When the defendant maintains that he was not the perpetrator, this becomes a very difficult, though probably not impossible,*[1] *burden to meet.* In this case, the defendant did not meet that burden.

*Id.* at 554–55, 573 A.2d 1317 (emphasis added).

Drawing on the cases and treatise cited above, it appears to us that there was no factual predicate for the expert testimo-

ny; there was no nexus between Dr. Fiester's proffered testimony and the particular facts of this case. Among other things, appellant never acknowledged that he murdered Ms. Martin. Therefore, it is not clear how testimony about an alleged impulse disorder would have been relevant to explain conduct that appellant denied. Put another way, appellant did not intend to present any evidence that would make the testimony that he suffered from the impulse control disorder relevant to his ability to form the requisite *mens rea.*

Moreover, the objective evidence clearly showed that the murderer acted with premeditation. We note, for example, that an individual was seen pacing near Ms. Martin's residence for hours before the murder, and the same person questioned a boy to learn where Ms. Martin lived. Inside Ms. Martin's residence, the cord to one telephone was cut and the other was missing. Two knives were found, as was a stick used to sharpen knives. This conduct is the antithesis of an impulsive act. Therefore, Dr. Fiester's testimony would not have made it more likely that the murderer acted without premeditation.

In addition, although appellant sought to admit expert testimony that he suffered from an impulse disorder, Dr. Fiester indicated that, even with the disorder, appellant was still sometimes able to control his impulses and he would be capable of planning a crime. Accordingly, the effect of the disorder on appellant's ability to form the requisite *mens rea,* and in explaining his earlier threats against Ms. Martin, was speculative.

The trial court was of the view that evidence of appellant's impulse disorder or his psychological profile would not assist the jurors and would serve to confuse them. As we see it, the court did not err, because there was no factual predicate for the expert testimony. Nor did the court abuse its discretion in excluding Dr. Fiester's testimony.

Appellant further claims that, by excluding Dr. Fiester's testimony the trial court prevented him from calling a witness on his behalf. Again, we disagree.

In *Redditt v. State,* 337 Md. 621, 655 A.2d 390 (1995), the Court of Appeals explained:

> The right of criminal defendants to call witnesses on their behalf is protected by the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment:
>
>> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* at 634–35, 655 A.2d 390 (quoting *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)).

Here, as discussed *supra,* Dr. Fiester's testimony was not relevant to the issues in the case. The doctor's testimony would merely have presented evidence that appellant suffered from an impulse control disorder, which sometimes prevented him from controlling his aggressive impulses. There was simply no evidence that Ms. Martin's murder was the result of an impulsive act. Appellant's due process rights were not violated.

## II.

■ Prior to trial, appellant filed a motion *in limine* to exclude the statements he made to Sargeant on April 9, 2001, during the medical intake screening at the Montgomery County Detention Center. Appellant alleged, *inter alia,* that the statements were privileged under Md.Code (2002), § 9–109 of the Courts and Judicial Proceedings Article ("C.J."), because they were made to a professional for the purpose of diagnos-

ing or treating the mental or emotional disorder of a patient.[3] Appellant also claimed that the statements were irrelevant as they were made more than a year prior to Ms. Martin's death.

At a hearing on the motion, Arthur Wallenstein, the Director of the Montgomery County Department of Correction and Rehabilitation, testified that the detention facility conducts a routine intake medical screening of every inmate entering the system and that their "sole and only focus was health care delivery." He added that the purpose of the screening is diagnostic and evaluative, is "conducted by a qualified medical professional," and includes mental health screening. The intake screening is then maintained as part of the inmate's medical record. On cross-examination, Wallenstein was asked if there could be any referrals as a result of the screenings. He responded: "Most likely not to the psychiatrist. The initial screening in our system would be to our crisis intervention unit or to an intake mental health screener . . . to someone who is trained."

Cynthia Sargeant, a registered nurse "specializing in psychiatric nursing," stated that she had "no advanced practice degree in psychiatric nursing." She explained that a medical intake screening is done for every inmate who comes into the detention center, stating: "The purpose of our meeting is for medical screening and obtaining medical information." She maintained, however, that she "was not doing medical care and treatment." Rather, she was simply doing an "intake."

According to Sargeant, if she believed during the screening that a mental health referral was necessary, she would "fill out a mental health referral form[.]" Indeed, she completed a referral for appellant to the "CIU staff." [4] Although Sargeant sometimes worked with the psychiatrist, she only transcribed

---

3. In the proceedings below, appellant also claimed privilege under C.J. § 9–109.1. On appeal, however, he has abandoned that contention. Therefore, we need not discuss it.

4. We believe "CIU" refers to the Crisis Intervention Unit.

orders for medications and did not take part in any therapy with the patients.

Sargeant's notes indicated that appellant used the word "obsession" during the intake. He also stated that, as a result of his obsession, he was requesting mental health treatment. Sargeant believed that appellant thought his statements were related to mental problems.

After the testimony, defense counsel argued:

Judge, I'm going to renew my objection to the nurse testifying in this matter. It's apparent, based on this witness'[s] testimony, that this is part of a delivery of medical services to the defendant.

And if you look at the Courts and Judicial Proceedings 9–109 A–3, based on this witness['s]; testimony, we have a nurse with some—we have a health care professional that is doing an intake here in this case of the defendant who is an inmate for a diagnostic and evaluative purposes who then passes this information along for purposes of medical disposition of inmate.

Now, this couldn't more clearly fall within the privilege.

Moreover, defendant counsel argued that the statements were irrelevant and lacked probative value. He based this contention on the fact that the statements were made over a year before Ms. Martin's death.

Two days after the hearing, in a written Opinion and Order, the trial court denied appellant's motion, stating:

Defendant's ... claim of privilege is that the Defendant's statements to the medical intake screener at the Montgomery County Detention Center ("MCDC") qualify as "Communications between patient and psychiatrist or psychologist" as defined in Section 9–109 of the Courts Article. Under Section 9–109(b), a "patient" has the privilege and the right to prevent disclosure of "(1) [c]ommunications relating to diagnosis or treatment of the patient; or (2)[a]ny information that by its nature would show the existence of a

medical record of the diagnosis or treatment." The term "patient" is defined under Section 9–109(a)(3):

"Patient" means a person who communicates or receives services regarding the diagnosis or treatment of his mental or emotional disorder from a psychiatrist, licensed psychologist, *or any other person participating directly or vitally with either in rendering those services in consultation with or under direct supervision of a psychiatrist or psychologist.* (emphasis added)

Initially, the court must take notice of the fact that " '[p]rivilege statutes must be narrowly construed.' " *Shady Grove Psychiatric Group v. State of Maryland,* 128 Md. App. 163 at 179, 736 A.2d 1168 (citing *Reynolds v. State,* 98 Md.App. at 368, 633 A.2d 455). The Court must also "recogniz[e] that a patient's interest in privacy must always be balanced against the judicial system's goal of ascertaining the truth ... [and] that the appropriate application of the privilege should be resolved on a case by case basis." *Shady Grove v. State,* 128 Md.App. 163 at 177, 736 A.2d 1168 (citing *Weisbeck v. Hess,* 524 N.W.2d 363).

The Court finds that the Defendant is not a "patient" as defined under Section 9–109(a)(3). The Defendant communicated information to a medical intake screener at MCDC who is an RN. The intake screener's duties are to take information from recent inmates concerning their whole medical condition. Information concerning their mental health status is one of ma[n]y topics about which the inmate is queried. Based upon the responses to the questions the intake screener will make appropriate referrals to health professionals. The intake screener at MCDC cannot be construed as "*a person participating directly or vitally with [a psychiatrist or psychologist] in rendering ... services in consultation with or under direct supervision of a psychiatrist or psychologist* " as defined in Section 9–109(a)(3).
(Emphasis in original).

We begin our analysis with C.J. § 9–109, entitled "**Communications between patient and psychiatrist or psychologist.**" It provides, in part:

(b) *Privilege generally.*—Unless otherwise provided, in all judicial, legislative, or administrative proceedings, a patient or the patient's authorized representative has a privilege to refuse to disclose, and to prevent a witness from disclosing:

(1) Communications relating to diagnosis or treatment of the patient; or

(2) Any information that by its nature would show the existence of a medical record of the diagnosis or treatment.

The definition of "patient" in C.J. § 9–109(a)(3) is also pertinent. The statute provides:

"Patient" means a person who communicates or receives services regarding the diagnosis or treatment of his mental or emotional disorder from a psychiatrist, licensed psychologist, or any other person participating directly or vitally with either in rendering those services in consultation with or under direct supervision of a psychiatrist or psychologist.

We are also mindful of C.J. § 5–609(a)(2), which defines a "mental health care provider" as follows: [5]

**§ 5–609. Mental health care providers or administrators.**

(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

(2) "Mental health care provider" means:

(i) A mental health care provider licensed under the Health Occupations Article; and

(ii) Any facility, corporation, partnership, association, or other entity that provides treatment or services to individuals who have mental disorders....

Appellant claims that, given the text of C.J. § 9–109, he clearly was a "patient" when he was interviewed by the nurse, because he was communicating his "obsession" to Sargeant "while requesting mental health treatment." Moreover, he contends that, because Sargeant made a referral to the psychi-

---

5. The parties do not rely on this provision.

atrist, she was participating "directly" and "vitally" in rendering those services. He asserts:

> The Montgomery County Detention Center is required as a matter of Maryland Statute and constitutional law to provide an inmate with the appropriate level of care, including mental health treatment. The routine medical intake screening, conducted by Nurse Sargeant in the present case, is one of the means to provide that care. The fact that part of the screening is for the purpose of obtaining a diagnosis and treatment for a mental health disorder makes the communication privileged and the trial court erred in allowing the State to introduce those privileged communications.

 The cardinal rule of statutory interpretation is to ascertain and effectuate the legislative intent. *Pete v. State*, 384 Md. 47, 57, 862 A.2d 419 (2004); *Consolidated Construction Svcs. v. Simpson*, 372 Md. 434, 456, 813 A.2d 260 (2002). "The starting point in statutory interpretation is with an examination of the language of the statute. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Jones v. State*, 336 Md. 255, 261, 647 A.2d 1204 (1994); *see Price v. State*, 378 Md. 378, 387, 835 A.2d 1221 (2003); *Gillespie v. State*, 370 Md. 219, 222, 804 A.2d 426 (2002); *Hackley v. State*, 161 Md.App. 1, 11, 866 A.2d 906 (2005). Stated another way, "[w]hen the words of the statute are clear and unambiguous, we need not go further." *State v. Thompson*, 332 Md. 1, 7, 629 A.2d 731 (1993); *see Pete*, 384 Md. at 58, 862 A.2d 419. In addition, we construe a statute as a whole, so that all provisions are considered together and harmonized to the extent possible. *Curran v. Price*, 334 Md. 149, 172, 638 A.2d 93 (1994); *Heartwood 88, Inc. v. Montgomery County*, 156 Md.App. 333, 359, 846 A.2d 1096 (2004). Moreover, in construing the statute in issue here, we are mindful that "[p]rivilege statutes must be narrowly construed." *Reynolds v. State*, 98 Md.App. 348, 368, 633 A.2d 455 (1993).

As we noted, appellant argues that his statements to the nurse were privileged because he was a "patient" during the medical screening. Under the principles of statutory construction, we generally ascribe to the legislative terminology the "[o]rdinary and popular understanding" of a particular term. *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484 (2004). In deciding the meaning of a statutory term or phrase, we may consult the dictionary. *Dep't. of Assessments & Taxation v. Maryland–Nat'l. Capital Park & Planning Comm'n.*, 348 Md. 2, 14, 702 A.2d 690 (1997); *Rouse–Fairwood Limited Partnership v. Supervisor of Assessments of Prince George's County*, 120 Md.App. 667, 687, 708 A.2d 19 (1998).

Applying the principles of statutory construction outlined above, we conclude that appellant's statements to Sargeant were not privileged. We explain.

The common definition of the word "patient," when used as a noun, is "an individual awaiting or under medical care and treatment." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, at 908 (11th ed.2003). In light of the testimony of both Wallenstein and Sargeant, appellant was not a patient at the relevant time. Rather, he was an inmate undergoing routine screening at the Detention Center. By responding to Sargeant's questions during the screening, Bryant was not transformed into a patient; Sargeant did not provide "treatment or services" to appellant under C.J. § 5–609(a)(2)(ii). That appellant might later become a patient, based on Sargeant's subsequent referral, does not alter the fact that he was not a patient within the meaning of C.J. § 9–109(a)(3) when Sargeant completed the screening form.

In any event, under C.J. § 5–609(b), if Sargeant were a mental health care provider, she would have been required "to provide protection from a patient's violent behavior" if she "knew of the patient's propensity for violence and the patient indicated ... by speech, conduct, or writing, of the patient's intention to inflict imminent physical injury upon a specified victim...." C.J. § 5–609(c)(2)(iii) provides that the duty is "discharged" if the mental health care provider "makes rea-

sonable and timely efforts to ... [i]nform the appropriate law enforcement agency" about the "threat" or the "specified victim...." [6]

Further, the trial court found that while Sargeant was gathering information for the purpose of possible treatment or diagnosis, she was not participating "directly or vitally" with a psychiatrist or psychologist in rendering treatment services to appellant. To the contrary, the nurse testified that she was not involved in inmate therapy and did not work with any psychiatrist or psychologist in connection with such treatment. And, even if appellant was eventually treated by a psychiatrist, Sargeant played no role in his therapy. Thus, the court's finding was not clearly erroneous.

■ Appellant also maintains that the trial court failed to address his relevancy argument. In his view, there was no relevance to appellant's statement, made on April 9, 2001, that he had "definite plans to kill [Ms. Martin] today," in that Ms. Martin was not killed until July 20, 2002.

We reject appellant's claim that the evidence of his statements in court and to Sargeant on April 9, 2001, were not relevant to the issues in the case. Bryant denied that he killed Ms. Martin. His statements on that date, to the effect that he intended to kill Ms. Martin and enjoyed seeing her blood, were probative of whether Bryant was, indeed, the one who killed Ms. Martin. They were also probative of the element of premeditation.

To be sure, one of the statements appellant made referred to his plans to kill Ms. Martin "today," but it was one of many threatening statements that included no time frame. Moreover, that appellant had plans to kill Ms. Martin "today" did not mean that he abandoned those plans when the day passed without appellant following through on his plan. In addition, the evidence demonstrated that there was no abating of the

---

6. C.J. § 5–609(d) bars a claim against a mental health care provider who breaches a patient's confidence by a good faith disclosure to third parties.

animosity between appellant and Ms. Martin. The victim sought to prevent appellant from discovering her whereabouts, and appellant was still required to have supervised visitation with his children.

The admissibility of evidence is generally vested in the sound discretion of the trial court. *See Conyers v. State,* 354 Md. 132, 176, 729 A.2d 910, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *Hopkins v. State,* 352 Md. 146, 158, 721 A.2d 231 (1998); *Blair v. State,* 130 Md.App. 571, 592–93, 747 A.2d 702 (2000); *see also* Md. Rule 5–104(a) (stating that "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court ..."). As a general rule, in order for evidence to be admissible, it must be relevant to the issues in the case and tend either to establish or disprove them. *Snyder v. State,* 361 Md. 580, 591, 762 A.2d 125 (2000); *Conyers,* 354 Md. at 176, 729 A.2d 910; *Rosenberg v. State,* 129 Md.App. 221, 252, 741 A.2d 533 (1999), *cert. denied,* 358 Md. 382, 749 A.2d 173 (2000). Maryland Rule 5–401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See also Johnson v. State,* 332 Md. 456, 472 n. 7, 632 A.2d 152 (1993) ("Evidence is relevant (and/or material) when it has a tendency to prove a proposition at issue in the case"). "Clearly, the question of whether a given fact is 'material' and thus relevant, depends on the underlying facts of the case. 'Evidence is material if it tends to establish a proposition that has legal significance to the litigation.' " *Jackson v. State,* 87 Md.App. 475, 484, 590 A.2d 177 (1991) (citation omitted).

Trial courts "retain wide latitude in determining what evidence is material and relevant[.]" *Merzbacher v. State,* 346 Md. 391, 413, 697 A.2d 432 (1997); *see Best v. State,* 79 Md.App. 241, 259, 556 A.2d 701 (stating that determination is "quintessentially" a matter of trial court's discretion), *cert. denied,* 317 Md. 70, 562 A.2d 718 (1989). Thus, "[a] trial judge's determination on relevance will not be reversed absent

an abuse of discretion." *Williams v. State,* 342 Md. 724, 737, 679 A.2d 1106 (1996); *see Ebb v. State,* 341 Md. 578, 587–88, 671 A.2d 974, *cert. denied,* 519 U.S. 832, 117 S.Ct. 102, 136 L.Ed.2d 56 (1996); *White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991). In our view, the trial court's ruling did not constitute an abuse of discretion.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**