REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2198

September Term, 2014

_____

JEFFREY MICHAEL SHIFLETT

v.

STATE OF MARYLAND

_____

Nazarian,
Reed,
Zarnoch, Robert A.
(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: September 28, 2016

After Katie Hadel was found stabbed to death in the bathtub of her apartment on February 5, 2013, Jeffrey Shiflett was charged with first-degree murder, first-degree assault, first-degree burglary, third-degree burglary, carrying a weapon openly with intent to injure, and two counts of second-degree assault. At trial in the Circuit Court for Baltimore County, Mr. Shiflett conceded that he killed her, and the contested issue was whether Mr. Shiflett, who has been diagnosed with multiple psychiatric disorders, was guilty of first- or second-degree murder. Ultimately, evidence of Mr. Shifflet's disorders was not permitted, and Mr. Shifflet was deemed competent after a mid-trial competency hearing. But because of Mr. Shiflett's disruptive behavior in and around the courtroom, the court ordered him restrained with a stun cuff during the proceedings, and when he refused, excluded him from the courtroom unless he agreed to wear it. As a result, much of the trial was conducted in his absence.

On appeal, Mr. Shiflett claims the circuit court abused its discretion by ordering him to wear a stun cuff as a condition of being present in the courtroom. In addition, he argues that the court erred by failing to strike the State's notice of intent to seek a sentence of life without parole; by excluding evidence of Mr. Shiflett's psychological profile; by concluding that Mr. Shiflett was competent to stand trial; and by denying his motion to dismiss the burglary count. We affirm his convictions.

## I. BACKGROUND

Mr. Shiflett and Ms. Hadel were childhood friends who became romantically involved in 2007. At that time, both Mr. Shiflett and Ms. Hadel used heroin and, as we will explain in more detail below, Mr. Shiflett suffered from several untreated mental

illnesses.  After Mr. Shiflett and Ms. Hadel participated in a robbery and Ms. Hadel was

caught on a security camera using a stolen credit card, both were placed on probation.  Mr.

Shiflett later violated probation and was imprisoned for the full five-year sentence.

While in prison, and until his release in 2012, Mr. Shiflett frequently wrote

threatening letters to Ms. Hadel, Ms. Hadel's mother, and Ms. Hadel's husband, Craig

Gordon.  In one letter, dated May 25, 2009 and addressed to Ms. Hadel, Mr. Shiflett

threatened her with a graphically violent death if she didn't comply with his wishes:

> I'm in prison and not a day goes buy [sic] to where I don't think
> about you putting me hear [sic] in this place.  It[']s all good
> why because they can't keep me forever one day I will leave
> this place.  When I do I will come looking for you and I will
> find you.  Where ever you might be I won't give up until I find
> you . . . You better hope you are telling me things I want to
> hear.  If not I will loose [sic] my mind and cut your fucking
> head off.

Another letter, dated March 10, 2010, addressed Ms. Hadel as "Dear Whore" and stated,

"Nobody sends me to prison and gets away with it.  It's not going to be hard to find you."

When he was released in December 2012, Mr. Shiflett moved in with his father in

Annapolis.  Mr. Shiflett's father testified that he believed his son's mental condition had

worsened in prison, where he'd spent a year-and-a-half in solitary confinement.  He

described his son's demeanor at the time as highly anxious, that he was unable to sleep or

eat and was obsessed with Ms. Hadel.  Mr. Shiflett continued to place phone calls to Ms.

Hadel and her mother, as well as to write about Ms. Hadel on his Facebook page.

Mr. Shiflett disappeared from his father's house around February 1, 2013.  And he

followed through with his threat to find Ms. Hadel: he walked from Annapolis to

Reisterstown and, by February 3, 2013, was camped out in the woods behind her apartment, waiting for her husband, Mr. Gordon, to leave. On the night of February 5, Mr. Shiflett broke into Ms. Hadel's apartment and he encountered Mr. Gordon's twelve-year old daughter, D,[1] lying in bed with her laptop. He screamed "Where the F is Katie?" at D, then dragged her down the hall toward Ms. Hadel's bedroom. He let go once he spotted Ms. Hadel near the bathroom, and he pulled out a knife. D escaped to a neighbor's house to get help, but by the time police arrived, Ms. Hadel had been stabbed sixteen times and was lying face down, "lifeless," in the bathtub. Two other children, a one-year-old and a three-year-old, were found in the apartment when police arrived; both were unharmed.

Mr. Shiflett was charged with first-degree murder, first-degree assault, first-degree burglary, third-degree burglary, carrying a weapon openly with intent to injure, and two counts of second-degree assault. He conceded that he was responsible for Ms. Hadel's murder, but disputed that the murder was premeditated. To that end, the defense attempted to introduce evidence of Mr. Shiflett's untreated mental illnesses to rebut the State's contention that he premeditated Ms. Hadel's murder, and when that failed, to demonstrate that Mr. Shiflett was not competent to stand trial. After a mid-trial hearing, the circuit court found him competent.

Before and throughout trial, Mr. Shiflett behaved in a disruptive and threatening manner. He directed his displeasure primarily, although not exclusively, toward the judge and the prosecutor; he addressed both using profane adaptations of their names. He was

---

[1] We use only her first initial to protect her privacy.

3

permitted to sit in the courtroom unrestrained during jury selection, but after Mr. Shiflett tried to force his way into the judge's chambers, the court ordered him to wear a stun cuff,[2] a device worn around the ankle that administers an electric shock, if he wanted to remain in the courtroom for the trial. He refused to wear it, and the trial continued while he remained in the courthouse lock-up, with a video and audio hook-up that allowed him to see and hear the proceedings.

The jury convicted Mr. Shiflett of first-degree premeditated murder, first-degree felony murder, and the remaining counts, except for one count of second-degree assault. At the sentencing hearing, he moved for jury sentencing, but the court denied his motion and sentenced him to life in prison without the possibility of parole. This timely appeal followed. We will provide more facts as appropriate to the discussion below.

## II. DISCUSSION

Mr. Shiflett presents five questions on appeal, which we address in a slightly different order.[3] *First*, he argues that the circuit court abused its discretion by ordering him

---

[2] The Baltimore County Sheriff's Office maintains a protocol for the use of a stun cuff, which defines it as "[a] conducted energy device that is secured to a subject's ankle and deployed remotely." The Sheriff goes on to describe the stun cuff as an electronic control device, that is, a "non-lethal device that emits an electronic energy charge, which causes electro-muscular disruption, which affects the sensory and motor functions of the central nervous system."

[3] Mr. Shiflett phrased the questions as follows in his brief:

> 1. Must Mr. Shiflett's life without parole sentence be vacated?
>
> 2. Did the trial court abuse its discretion when it refused to permit defense counsel to introduce expert testimony about Mr. Shiflett's psychological profile, when such testimony

4

to wear a stun cuff, then by proceeding with trial in his absence when he refused to wear it. *Second*, he argues that he was entitled to have a jury determine whether he should be sentenced to life without the possibility of parole, and that his life sentence, administered by the court rather than by the jury, is unconstitutional. *Third*, Mr. Shiflett argues that the trial court erred by refusing to admit testimony regarding his psychological profile, and *fourth*, in its decision that he was competent to stand trial. *Finally*, Mr. Shiflett argues that the court erred by refusing to dismiss the first-degree burglary count.

### A. The Circuit Court Did Not Abuse Its Discretion In Requiring Mr. Shiflett To Wear A Stun Cuff To Remain In The Courtroom.

Mr. Shiflett argues *first* that the circuit court erred by ordering him to wear a stun cuff as a condition of remaining in the courtroom, then by allowing the trial to proceed in his absence when he refused to wear it. In-court physical restraints are inherently prejudicial to criminal defendants in that they can diminish the accused's ability to mount a meaningful defense as well as his ability to communicate with his lawyer, *Deck v.*

---

was relevant to his ability to premeditate and form the requisite intent?

3. Did the trial court abuse its discretion when it ordered Mr. Shiflett to wear a stun cuff and when it thereafter permitted trial to proceed in his absence after he refused to wear the cuff?

4. Did the trial court err when it determined after a mid-trial competency hearing that Mr. Shiflett was competent to stand trial?

5. Did the trial court err when it denied defense counsel's motion to dismiss the burglary count?

*Missouri*, 544 U.S. 622, 631 (2005), and no reported Maryland decision has considered whether and under what circumstances a stun cuff can serve as a courtroom restraint during a jury trial. We begin, then, with a closer look at Mr. Shiflett's behavior, the range of options available to the trial court, and the court's responses.

Mr. Shiflett's statements and conduct had raised serious security concerns for the court long before trial. In the weeks leading up to jury selection, he'd taken to writing the presiding judge letters that he sent to her home. We decline to memorialize the text of those letters in the Maryland Appellate Reports—trust us when we say that their contents were thoroughly inappropriate and venomously vulgar.

It was the Sheriff who first recommended placing Mr. Shiflett in a stun cuff after listening to a phone call Mr. Shiflett placed to his father from prison. In that particular call, Mr. Shiflett reacted to the court's ruling that he would not be permitted to introduce psychiatric testimony; the call contained "a tremendous amount of profanity and some rather horrific statements" about Ms. Hadel. Defense counsel objected to the Sheriff's recommendation, and after learning that Mr. Shiflett had not made any direct threats against the court or the prosecutor, the court declined to order Mr. Shiflett to wear the stun cuff in the courtroom:

> As counsel knows in this case, Mr. Shiflett has written to me on many occasions. Even though I keep writing back to him telling him not to write to me, he continues to write to me. And in many of his letters, there was never a direct threat against me or the Prosecutor—or either Prosecutor, but certainly language that this Court would consider to be highly inappropriate, vulgar and heated in terms [you would] describe a letter as heated. And this Court never felt in any way that there was a threat against her cause if I did, I would have

6

brought that to the attention frankly—of the Sheriff's office and of the State and decisions would have been made based on that.

So considering the factors, being aware of the security necessary for this trial . . . I'm not going to order that the ankle cuff be put in. I appreciate why the Sheriff's office wanted to put it in. I think in this particular case, I don't believe it will [be] necessary. If at any time I feel that it becomes necessary, then I will modify my order.

Jury selection then went forward as scheduled, and Mr. Shiflett was disruptive throughout that process. He made "constant remarks, often time inappropriate remarks, often vulgar remarks, often obscene remarks, for which the Court either tolerated . . . or admonished him to stop speaking." Still, jury selection continued, and at that point the court elected not to revise its ruling on the stun cuff. But the next morning, before the courtroom day got under way, Mr. Shiflett attempted to break free from the guards and enter the judge's chambers. A scuffle ensued as sheriffs tried to restrain him; they were eventually able to move him away from the judge, but not before he spit in a sheriff's face:

This morning at ten to ten as Mr. Shiflett . . . was being brought to begin the trial, he attempted to—I was in chambers and I heard him call out my name, my first name, several times, and saying [the Judge's name], which is my first name, and then he attempted to enter my chambers. At that point, the sheriffs—and there was three or four of them I believe that were with him at that time—moved him away from my chambers, put him up against the wall and attempted to calm him down and deter him from trying to enter my chambers in what appeared to be his effort to want to talk to me.

They then moved him over into the courtroom and tried to get him to sit down. A scuffle occurred, and they were unable to really secure him, continued to become more agitated and resistive in his behavior. After that the sheriffs then took

7

him back into the lockup, and I believe [defense counsel] came around as well in an effort to calm down Mr. Shiflett.

> I subsequently had a chambers conference with counsel, indicated my concern for courtroom security. I also had an opportunity to talk to the sheriffs since I did not witness all of the behavior of Mr. Shiflett. I only heard him screaming out and calling my first name. In further talking to the sheriffs, they indicated to me not only were they hav[ing] difficulty securing him, but that he also spit at one of the sheriffs. And then they attempted again to push him down the hallway to try and secure his attendance into the courtroom.

> I told counsel in chambers based on his behavior this morning, that it was this Court's intent and concern for courtroom security and his highly agitated state that I was going to order the sheriffs to place a cuff on him that would administer a shock if he acted up. And that was this Court's decision. It was decided at that time to put all this on the record, and then go back to talk to Mr. Shiflett.

The court went on to explain that she wanted to place Mr. Shiflett in a stun cuff because she thought "his rights are more secure and the appearance to the jury would be less intrusive with the cuff than with six sheriffs standing around him."

The judge and counsel then proceeded to Mr. Shiflett's holding cell, where the court (with a court reporter present) gave Mr. Shiflett the opportunity to return to the courtroom if he agreed to wear the stun cuff:

> THE COURT: The purpose of this hearing, Mr. Shiflett . . . — we are in lockup, this hearing is being held in lockup—is based on your behavior this morning.
>
> *      *      *
>
> So based on your behavior, I have determined that the only way to maintain courtroom security, which is my job, is to have the cuff on you.

8

Now, you can choose not to use the cuff, not to wear the cuff. And if you choose to do that, then you will be waiving your right to be in the courtroom. You have an absolute right to be in the courtroom and participate in the proceedings. I have the absolute right as the Judge to determine courtroom security.

It is my decision, based on your conduct this morning, that you wear the cuff.

[MR. SHIFLETT]: All right—

THE COURT: By not complying with my order, you are waiving your right under [Md. Rule] 4-231. So I wanted to advise you of your right to be present[.]

Amidst the confusion that followed, Mr. Shiflett responded that "I'm not going to wear that fucking cuff," and the court explained the implications of his decision:

THE COURT: So as a result of your refusal to comply with my order, and I'm doing this based on your behavior this morning and this Court's concern about courtroom security, then you will be waiving your right to be present at trial, and the trial will continue—

[MR. SHIFLETT]: And I am not waiving my right to be present at trial. Put the microphone right here. I am not waiving my right to be present at the trial today. I want to be in the courtroom, but I'm not going to be treated like I'm some fucking kind of animal. Thank you.

THE COURT: Okay.

[MR. SHIFLETT]: Now, let me say something about this bracelet.

THE COURT: So the trial—you understand the trial will continue without your presence.

[MR. SHIFLETT]: I don't really care about that. That's fine.
\*      \*      \*

9

THE COURT: Okay. All right. So I'm going to leave you in your cell, and every time we have a break, I'm going to revisit this issue with you. So you will continue to have the right to consult with a lawyer. I am not going to have you sent back to the jail. We will continue to explore the option for you to come back into court.

From there, the trial continued in Mr. Shiflett's absence. During the luncheon recess that same day, the judge, the prosecutor, and defense counsel returned to Mr. Shiflett's cell, and Mr. Shiflett maintained his refusal to wear the stun cuff in the courtroom:

[MR. SHIFLETT]: I ain't seeing that nasty bitch.

[DEFENSE COUNSEL]: We're about to go on the record.

[MR. SHIFLETT]: Woo-hoo.

THE COURT: All right. Mr. Shiflett, we are back—

[MR. SHIFLETT]: Hey—

THE COURT: We are back—

[MR. SHIFLETT]: —baby [Judge][4] Hey, babe.

THE COURT: We are back on the record—

[MR. SHIFLETT]: Hey babe.

THE COURT: I am Judge [last name], Mr. Shiflett.

[MR. SHIFLETT]: You're baby [Judge] to me.

THE COURT: (Inaudible) address me in that way.

[MR. SHIFLETT]: You're baby [Judge].

THE COURT: We are back on the record—

---

[4] We refer in the block quotes to the identity of the person being addressed rather than reproducing Mr. Shiflett's names for them.

[MR. SHIFLETT]: I have to think up a nickname for (inaudible).

THE COURT: —in the State of Maryland versus Jeffrey Shiflett, case Number K-13-1295.

[MR. SHIFLETT]: Is [Prosecutor] for the State?

THE COURT: We are now present—I am present, [defense counsel and the State] are here as well—

[MR. SHIFLETT]: Oh, shit.

THE COURT: —along with my court clerk.

[MR. SHIFLETT]: Oh, shit.

THE COURT: I'm here to advise you of where we are in the proceeding and of your right to go back into the court if you choose to. We have concluded with three or four witnesses—

[MR. SHIFLETT]: And I should have been there so I can fucking hear what they have to say about me, and so I could have told me [sic] attorney some fucking questions to ask them that I might thought that was relevant to this case, and I was denied my constitutional right, but we all know they don't give a fuck about people's rights around here.

THE COURT: So, Mr.—

[MR. SHIFLETT]: Ain't that right [Prosecutor]?

THE COURT: Mr.—

[MR. SHIFLETT]: Yes, ma'am.

THE COURT: —Shiflett—

[MR. SHIFLETT]: Hey, babe.

*      *      *

11

THE COURT: I'm giving you the opportunity to come to the courtroom.

[MR. SHIFLETT]: Does it look like I want to come back to the courtroom?

THE COURT: Sir—

[MR. SHIFLETT]: All right. Hold on. I want to come back—I'm going to say one thing, okay, for this record here. For this record, I—I got to make it known, okay, that I do suffer from a mood disorder, okay?

Another thing I do have to make a note for the record is at night, I don't get a chance to go to sleep because I go back to my cell and I constantly think about this case, and I just stay up all night with my mind's spinning in circles, okay? And when I don't get any sleep, I get very moody and I get very agitated very easily, especially when asshole police officers try to put their hands on me for no unapparent reason, okay?

Just so everybody knows that stuff. You know, I like to make sure that everybody understands.

THE COURT: Thank you for sharing that with us.

[MR. SHIFLETT]: Hey, baby, I'll share anything with you. What about you share with me? That's what I want to know.

\* \* \*

[DEFENSE COUNSEL]: Jeff, do you want to come into the courtroom or not?

[MR. SHIFLETT]: Fuck, no, I ain't coming into that mother. You're going to put that fucking bracelet on me and treat me like a fucking animal, you think I'm going—another thing I want to say about that. One thing I can tell you about that bracelet okay? It's inhumane to fucking have me wear that, okay?

THE COURT: Go ahead.

12

[MR. SHIFLETT]: There's enough sheriffs here to fucking have 20 sheriffs in that courtroom to where if I acted up, you could have 20 sheriffs do something to me. I don't need a fucking bracelet on my fucking leg to treat me like I'm a fucking cow and you're going to use a cattle prod on me and tame me.

THE COURT: Go ahead.

[DEFENSE COUNSEL]: So what—

[MR. SHIFLETT]: Are you fucking crazy?

[DEFENSE COUNSEL]: So what you're saying is that you don't want to come to the courtroom now?

[MR. SHIFLETT]: I don't waive no rights. I want to fucking come into the courtroom. But I'm not wearing a fucking bracelet and being treated like an animal.

THE COURT: The only way you're coming into my courtroom, sir, is with that bracelet—

[MR. SHIFLETT]: Oh, well.

THE COURT: —that's it.

[MR. SHIFLETT]: (Inaudible) highly agitated? Let's fuck so I can release some of my stress, baby. Hey [Prosecutor], you're a faggot. You take it up the ass (inaudible) you faggot, you queer, you homosexual. I love you baby [Judge].

The trial continued in Mr. Shiflett's absence. But later that day, the court was forced to excuse the jury when the Sheriff discovered that Mr. Shiflett had created another disturbance:

THE SHERIFF: We got a situation that he—we got a situation that he shitted in a—in a cell.

THE COURT: He's—

13

THE SHERIFF: He's shitted in the cell on the floor.

THE COURT: Okay.

\*    \*    \*

THE SHERIFF: My sergeant—sergeant is going down to get a shield because we don't know what's going to happen once we go in, if he's going to throw it or not.

THE COURT: If he's going to?

THE SHERIFF: Throw it.

[DEFENSE COUNSEL]: Throw something.

THE COURT: Okay. All right. So do you know what is currently in the cell at this point in time other than toilet paper? There's no—

THE SHERIFF: Feces.

THE COURT: I'm sorry, feces?

THE SHERIFF: Feces that he did on the floor.

THE COURT: Okay.

THE SHERIFF: Right in front of the door.

THE COURT: In front of the door. Okay. So—and I appreciate you bring[ing] it to our attention, and you want to deal with it now. So what do you want to do specifically?

THE SHERIFF: Basically just want to take him back to the—to the jail.

\*    \*    \*

THE COURT: Okay. All right. So you—you—you now have permission to go ahead and remove him and take him back to the Detention Center.

14

It was not my plan to talk with him again today. I've already talked to him twice today, and I will talk with him again tomorrow. But my plan, frankly, is not—unless things dramatically change, I planned to speak with him once a day, perhaps twice, but I'm not going to speak with him on every break.

[DEFENSE COUNSEL]: Okay.

THE COURT: I don't feel there's any reason to do that. I will once again continue to reiterate to him when I do have the opportunity to speak to him about his right to be present and how he can be present in order to comply with this Court's order.

[DEFENSE COUNSEL]: Well, it is a fluid situation.

THE COURT: Uh-huh.

[DEFENSE COUNSEL]: And at—at some point if he indicates to me—

THE COURT: Uh-huh.

[DEFENSE COUNSEL]: —that he decides to be in the courtroom, I will bring that to the Court's attention.

The next morning, a video monitor was set up in the courtroom so that Mr. Shiflett could see and hear what was transpiring in the courtroom from the detention center. The court reviewed the sheriff's stun cuff protocol with Mr. Shiflett, and also gave him another opportunity to return to the courtroom:

THE COURT: Okay. Mr. Shiflett, we are on record. I've called your case and your attorneys are present. I wanted to put a couple of things on the record.

I have provided your attorney with the protocol for the use of the stun cuff that is dated September the 1st, 2011, and—and I wanted a court exhibit that will now become part of the

15

record. Have you had an opportunity to review that with your attorney?

[MR. SHIFLETT]: (Inaudible).

THE COURT: Okay, did he talk to you about it?

[MR. SHIFLETT]: No. He just told me that you gave him some paperwork for me. That's all.

THE COURT: Okay. Well, I'm going to review it with you now. So this is an order that is—was developed by the sheriff's office that gives the protocol for when the stun cuff can be used. Specifically it says under Paragraph 3-B, that it can be used to control violent or potentially violent prisoners when a member, which is a sheriff, reasonably believes that the following conditions exist: Number one, lethal force does not appear to be justifiable and/or necessary, attempts to subdue the individual by conventional tactics will likely cause injury to the individual members, c[o]urt personnel or citizens, and then there will be a reasonable expectation that will be unsafe for members to be approaching the individual within contact range.

Those are the—the criteria for use of a stun cuff, which also includes persons that are trained to use it, where they affix it which is in your—at your ankle level, and the—the proper use of it, and the—the only criteria, which are the ones I just described.

Do you understand?

[MR. SHIFLETT]: Basically you're trying to treat me like a fucking animal.

THE COURT: No, sir.

[MR. SHIFLETT]: (Inaudible).

THE COURT: It is this Court's job to insure courtroom security. Based on your actions yesterday, you have demonstrated to the Court that you will not comply with this Court's position that you must—your conduct must comply

16

with proper courtroom decorum. This Court has concerns, based [on your] conduct yesterday, of both safety of the courtroom personnel, myself, other members of the courtroom staff, and for those reasons, I find that you are a security risk, that you have exhibited violent behavior and threatening behavior in your conduct yesterday, and that is the reason that I have ordered the—the cuff to be placed.

You can return to the courtroom if you can—

[MR. SHIFLETT]: (Inaudible).

THE COURT: Let me just—just listen to me. You can return—

[MR. SHIFLETT]: It doesn't matter.

THE COURT: You can return—

[MR. SHIFLETT]: (Inaudible).

THE COURT: All right. So you can return to the courtroom if you promise that you will comply with the rules of civility and act appropriately and behave in a proper manner.

[MR. SHIFLETT]: I don't know how to live civilized.

THE COURT: I'm sorry?

[MR. SHIFLETT]: I don't know how to live civilized.

THE COURT: You don't know how to live civilized, is that what you[] said?

[MR. SHIFLETT]: Yes, ma'am.

THE COURT: Okay. All right. So I have offered you the right to come in. You have indicated you are unable to comply and live civilized and comply with it. I've also indicated to you that you can come in with the—the cuff, and you have indicated that you are unwilling to do that, is that correct?

17

[MR. SHIFLETT]: Yes, because Amendment Number Eight says that prohibits (inaudible) cruel and unusual punishment. You're not going to treat me like an animal. You have more than enough officers (inaudible) in the courtroom. And I'm not wearing that cuff so people on the jury can see me and see that you people are treating me like an animal.

THE COURT: All right. Just to be clear, Mr. Shiflett, the cuff is not visible. It is under your pant leg. It can only be administered by the sheriff who is trained in it—

[MR. SHIFLETT]: And what happens if the jury sees you drop me and people shock me?

THE COURT: You would not—well, first off, they could not—

[MR. SHIFLETT]: (Inaudible) they couldn't see that either?

THE COURT: They would not see the cuff. And—

[MR. SHIFLETT]: (Inaudible) get out of here with this dumb shit.

THE COURT: And the shock can only be administered under those three very limited areas that I described.

[MR. SHIFLETT]: Well, tell [Prosecutor] I want to shock his balls.

THE COURT: So I understand that you are refusing to comply with my order, that you will not come into the courtroom and act in a civilized manner and—

[MR. SHIFLETT]: No.

THE COURT: —I have—I have offered that to you, to participate. You can change your mind at anytime, and I will continue to offer you[] that option during the day. If at any time you change your mind, you can let the sheriff know . . .

18

On at least one occasion every day through the conclusion of trial, the court met with Mr. Shiflett, on the record and with counsel present, and offered him the opportunity to return to the courtroom with the stun cuff on. Each time, he refused.

### 1. The court did not abuse its discretion in deciding that restraints were necessary.

Mr. Shiflett argues that, as a preliminary matter, the court's decision to order restraints of any kind was an abuse of discretion. Visible physical restraints during trial are inherently prejudicial to criminal defendants because they "highlight the need to separate the defendant from the community at large," and undermine the presumption of innocence and the fairness of the fact-finding process. *Wagner v. State*, 213 Md. App. 419, 476-77 (2013) (quoting *Hunt v. State*, 321 Md. 387, 409 (1990)); *see also Deck*, 544 U.S. at 630 (2007), *People v. Allen*, 856 N.E.2d 349, 352 (Ill. 2006) ("The presumption of innocence is central to our administration of justice. In the absence of exceptional circumstances, an accused has the right to stand trial with the appearance, dignity, and self-respect of a free and innocent man.") (citations omitted). For that reason, the Due Process Clause "prohibits the use of physical restraints visible to a jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck*, 544 U.S. at 629. This applies to both the guilt and sentencing phases of trial. *Id.* at 633.

Even so, three essential state interests "may justify physically restraining a defendant: Preventing the defendant's escape, protecting those in the courtroom, and maintaining order in the courtroom." *Wagner*, 213 Md. App. at 477 (quoting *Holbrook v.*

*Flynn*, 475 U.S. 560, 569 (1986)). "Where a defendant is 'disruptive, contumacious, stubbornly defiant' in a manner that interferes with the dignity, order, and decorum of the courtroom, the trial court has the discretion to order 'constitutionally permissible' accommodations." *In re D.M.*, 228 Md. App. 451, 455 (2016) (citing *Illinois v. Allen*, 337 U.S. 343-44 (1970)). So restraints aren't *per se* unconstitutional—the issue in each case is whether the restraint "was so inherently prejudicial that [Mr. Shiflett] was thereby denied his constitutional right to a fair trial. *Holbrook*, 475 U.S. at 567, 570. "The prejudice posed by security measures, and whether a compelling state interest outweighs that prejudice, must be measured on a case-by-case basis." *Hunt*, 321 Md. at 410. And ultimately, restraints are appropriate if, after making an individual evaluation, the court decides that the need for the restraint outweighs the potential prejudice, and ensures that the record reflects the need for extraordinary security measures. *Id.*

Mr. Shiflett acknowledges, as he must, that physical restraints may be appropriate when the court makes a particularized finding on the record that a compelling interest outweighs the prejudice to the defendant. Instead, he argues that his behavior at trial did not justify restraining him in the manner the court ordered here. By Mr. Shiflett's account, he simply tried to enter the presiding judge's chambers in an attempt to talk to her. Although his actions undoubtedly were inappropriate, he argues, they failed to demonstrate any concrete threat, and did not support a finding that restraints were necessary. This argument isn't borne out by the transcript though, which reveals that Mr. Shiflett screamed the judge's name from outside her chambers until he was forcibly restrained, which resulted in a fracas during which Mr. Shiflett spit in a sheriff's face. By the time this

20

incident occurred, Mr. Shiflett had already sent the presiding judge inappropriate, vulgar letters at her home address, and the sheriff had already recommended that the court order Mr. Shiflett to wear the stun cuff in light of his phone calls from prison. The incident formed the basis for the court's on-record, particularized finding that Mr. Shiflett posed a threat to courtroom security, and we discern no abuse of discretion in that finding, and Mr. Shiflett's subsequent demeanor and behavior only confirmed the correctness of the court's assessment. And as such, the court did not err when it ordered Mr. Shiflett restrained, so long as the need to protect courtroom order and security outweighed any prejudice to Mr. Shiflett that might result from the restraint imposed.

### 2. The court's compelling interest in maintaining security and order outweighed any prejudice to Mr. Shiflett.

Assuming that we would disagree with his contention that no restraints were required, Mr. Shiflett argues *next* that the security measures imposed by the court—an ultimatum to wear the stun cuff or be excluded from the court room—was unreasonable. He contends that the cuff would have put him at risk of injury, and would have unfairly prejudiced him by interfering with his ability to participate in his own defense and to consult with counsel. He asks us to hold that the court abused its discretion in ordering him to wear the cuff when other (in his view, less prejudicial) options were available, such as leg irons or ordering additional sheriffs to guard him in the courtroom.

His argument flows, however, from the faulty premise that judges are required to employ the least restrictive alternative, as judged by twenty-twenty hindsight. The standard is in fact more realistic. "Trial judges confronted with disruptive, contumacious,

stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Allen*, 397 U.S. at 344. And therefore, judges have "broad discretion in maintaining courtroom security," and we review a trial judge's decision regarding the manner of restraint for abuse of discretion. *Hunt*, 321 Md. at 408. We need not determine "whether less stringent security measures were available to the trial court, but whether the measures applied were reasonable, and whether they posed an unacceptable risk of prejudice to the defendant." *Id.* Instead, we assess the methods the court actually used— the requirement that Mr. Shiflett wear the stun cuff as a condition of remaining in the courtroom—in the context of the security and behavioral threats he posed.

*First*, we hold that the court's decision to exclude Mr. Shiflett from the courtroom was reasonable under the circumstances. The Sixth Amendment guarantees a defendant the right to be present at every stage of his trial, but a defendant "who engages in conduct that justifies exclusion from the courtroom" waives that right. Md. Rule 4-231(c)(1)-(2). The Supreme Court held in *Illinois v. Allen* that a trial judge confronted with a disruptive defendant can "(1) bind and gag the defendant, thereby [keeping the defendant in the courtroom]; (2) cite [the defendant] for contempt; or (3) take him out of the courtroom until he promises to conduct himself properly." 397 U.S. at 344. Those possible alternatives aren't exhaustive, though; courts faced with similarly recalcitrant defendants have employed these security methods, and others, to varying degrees of success, and the "appropriateness and lawfulness of any action taken in a given case will depend naturally on the facts of each case." *Smith v. State*, 382 Md. 329, 343-45 (2004) (approving the trial court's decision to cite a disruptive defendant for contempt three times throughout his trial);

22

*see also Bruce v. State*, 318 Md. 706, 720 (1990) (upholding the trial court's decision to post four plainclothes marshals in addition to two bailiffs as a security measure); *Bowers v. State*, 306 Md. 120, 138 (1986) (finding no abuse of discretion in the trial court's decision, at the recommendation of the sheriff's office, to order the defendant to wear leg irons during trial); *Wagner*, 213 Md. App. at 481 (observing that no prejudice resulted from placing the defendant in shackles for the jury's verdict announcement, because the shackles were hidden by the defendant's suit coat, while his leg irons were obscured because he was standing up). However, "trial in absentia should be the extraordinary case, 'undertaken only after the exercise of a careful discretion by the trial court." *Biglari v. State*, 156 Md. App. 657, 674 (2004) (quoting *Pinkney v. State*, 350 Md. 201, 221 (1998)).

Mr. Shiflett did not simply speak out of turn or make the occasional outburst. He consistently used angry, vulgar, and violent language with the court. He repeatedly threatened the judge and the prosecutor. And he defecated on the floor of his cell in a temporarily successful effort to prevent the trial from proceeding. Faced with this magnitude of disruption to the proceedings and to the safety and security of everyone involved, the court chose *Allen's* third option, *i.e.*, to remove Mr. Shiflett from the courtroom until he agreed to conduct himself appropriately. *See* 397 U.S. at 344. The court offered Mr. Shiflett numerous opportunities to return and behave, and he refused all of them. Mr. Shiflett's Sixth Amendment rights did not entitle him to thwart his trial, and the court was well within its discretion to exclude him rather than binding and gagging him (which might have created even more prejudice than excluding him altogether), citing him for contempt (which would have been pointless in this case), or trying other methods of

23

restraining him, such as adding further shackles or other physical restraints or increasing the number of security personnel in the room. *Smith*, 382 Md. at 343; *Wagner*, 213 Md. App. at 481.

*Second*, we discern no abuse of discretion in the court's decision to condition Mr. Shiflett's reentry to the courtroom upon agreement to wear the stun cuff. The constitutional right to be tried without physical restraint, once lost, "can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." *Allen*, 397 U.S. at 343. To that end, a court "that removes the defendant from the courtroom must advise him of the opportunity to return if he promises to behave." *Biglari*, 156 Md. App. at 671. But at each of the court's post-removal meetings with him, and we count at least four, Mr. Shiflett emphatically declined this opportunity. Each time the court consulted with Mr. Shiflett in lockup, he refused unequivocally to promise that he would behave, choosing instead to continue flinging profanity and sexually explicit insults at the judge and prosecutor.

Because his erratic behavior continued and escalated as the trial progressed, even after his removal, the court was entirely justified in removing Mr. Shiflett from the court room and in setting conditions for his return. We agree as well that requiring him to wear the stun cuff was a reasonable condition. Mr. Shiflett complains that the cuff would have put him at risk of injury in the event he became immobilized and fell when a shock was delivered,[5] and that its chilling effect might have impaired his ability to participate in his

_____

[5] The sheriff's protocol for using the stun cuff describes it as "designed for temporary immobilization of a subject [that] should not cause any significant injury." However, the

24

own defense. Those risks are real, and we do not seek to diminish them, although Mr. Shiflett's categorical refusal even to try it on[6] leaves us no record on which to evaluate the likelihood or extent of the risk he faced. Even so, and assuming that the risks were as Mr. Shiflett contends, they were outweighed by court's compelling interests in order, safety, and security. And we also see no abuse of discretion in the court's assessment that alternatives, such as binding or gagging or shackling or surrounding Mr. Shiflett with an entourage of law enforcement personnel, would have risked causing at least as much prejudice before the jury as the stun cuff.

By his own reckoning, Mr. Shiflett behaved as he did in order to prevent his trial from proceeding. His conduct, and no one else's, created the problems the court was forced to solve. He complains now that the court abused its discretion in restraining him, but "our courts, palladiums of liberty as they are, cannot be treated disrespectfully with impunity." *Allen*, 397 U.S. at 346. Mr. Shiflett put the court to a delicate balancing challenge. He faced serious charges, and obviously has important constitutional rights that the court was obliged to recognize and protect. At the same time, Mr. Shiflett was not in control of the process, and the court was equally not obliged to let him disrupt the trial and threaten court personnel.

---

protocol warns that "a subject may receive secondary injuries as a result of falling when the subject is immobilized."

[6] We note as well that at no point, in the circuit court or here, did Mr. Shiflett or counsel propose, let alone agree to, any alternative form of restraint.

25

Because Mr. Shiflett never wore the stun cuff or attempted to discover its impacts or limits, this case affords us no opportunity to rule broadly on its uses or limitations as a restraint. We recognize that stun cuffs are a potentially severe form of restraint, one that could be calibrated or applied improperly, and there is something viscerally disturbing about a device that administers electric shocks to another human being. That all said, Mr. Shiflett left the court with no choice—he was determined to thwart his trial, and his aggressive refusal even to attempt to conduct himself appropriately waived his right to be present in the courtroom for trial. We see no abuse of discretion in the court's patient efforts to find a way for Mr. Shiflett to return and participate in his trial, or in its decision to condition his return on an agreement to wear the stun cuff.

## B. The Trial Court Correctly Denied the Motion For Jury Sentencing.

*Second*, Mr. Shiflett argues that because the State filed a notice of intention to seek a sentence of life without the possibility of parole, he was entitled to elect sentencing by jury, and the circuit court erred in denying his motion for sentencing by jury. His argument is primarily a statutory one—that the language the General Assembly left behind in Md. Code (2002, 2012 Repl. Vol., 2015 Supp.), § 2-304(b) of the Criminal Law Article ("CR"), after removing the parts relating to the death penalty,[7] extended to defendants facing life

---

[7] CR § 2-304, as amended, provides in subsection (a) that a court should conduct the sentencing proceeding in life without parole cases, but in subsection (b) provides for jury sentencing. We reproduce the applicable sections below, providing emphasis to indicate the references to the jury upon which Mr. Shiflett relies:

> (a) *In general.* − If the State gave notice under § 2-203(1) of this title, *the court* shall conduct a separate sentencing

without parole the sentencing by jury procedures previously reserved for capital defendants. He argues as well that once Maryland repealed its death penalty, a sentence of life without the possibility of parole is more than an enhanced sentence—it is "the harshest sentence that can be imposed on a defendant in this State," to which the constitutional protections accorded previously to defendants facing life sentences now attach.

In the time since the briefs were filed in this case, however, we had occasion to address and reject the same arguments in *Bellard v. State*, __ Md. App. __ No. 1281, Sept. Term 2014 (filed August 31, 2016). As the Supreme Court's death penalty jurisprudence has long recognized, the death penalty is different, and the unique permanence of capital punishment compels procedural safeguards that other punishments do not—even punishments, such as life imprisonment without parole, that are meant to be permanent.

---

proceeding as soon as practicable after the defendant is found guilty of murder in the first degree to determine whether the defendant shall be sentenced to imprisonment for life without the possibility of parole or to imprisonment for life.

(b) Findings. – (1) A determination by *a jury* to impose a sentence of imprisonment for life without the possibility of parole must be unanimous.

(2) If *the jury* finds that a sentence of imprisonment for life without the possibility of parole shall be imposed, the court shall impose a sentence of imprisonment of life without the possibility of parole.

(3) If, within a reasonable time, *the jury* is unable to agree to imposition of a sentence of imprisonment for life without the possibility of parole, the court shall impose a sentence of imprisonment for life.

(Emphases added.)

27

*Bellard*, slip op. at 11-12. Although the legislation repealing Maryland's death penalty did, through apparent clerical inadvertence, create some ambiguity in the statute governing sentencing procedures in life without parole cases, *see id*. at 14-17, the structure and legislative history left no doubt that the purpose of that legislation was to repeal the death penalty, not to alter the sentencing procedures or create new rights for defendants where the State seeks life without parole:

> But we need not dig deeply into Senate Bill 276 to find its purpose. The bill's Preamble says in so many words that its purpose was "repealing the death penalty," and the Fiscal and Policy Note states that the bill "repeals the death penalty and all provisions relating to it." Fiscal and Policy Note Revised, S.B. 276 Md. at 1. Neither mentions other alterations to the sentencing authority or procedures for first-degree murder, and the provisions of the bill itself simply removed portions of the Maryland Code relating to the death penalty and replaced references to repealed language. This obviously was a complicated task, and details can—and apparently did—get overlooked. But our two alternatives are to acknowledge that subsection (b) of CR § 2-304 has become purely vestigial, or to interpolate an intention on the part of the General Assembly to create jury sentencing rights that previously didn't exist in non-capital first-degree murder cases. We see nothing in the purpose or language of the legislation itself that suggests any intent to expand jury sentencing to defendants facing life without parole. And although we could have stopped there, we reviewed the legislative history as well, and it too supports a conclusion that the purpose of the legislation was to repeal the death penalty, rather than alter sentencing procedures in non-capital murder cases.

*Id*. at 18.

In rejecting Mr. Shiflett's contention that Section 2-304 unambiguously requires that a life without parole sentence be imposed by a jury, we must also reject his request that we apply the rule of lenity. The rule, which would require that we construe in favor

28

of the defendant any ambiguity in a criminal penal statute, applies only when a "statute is open to more than one interpretation *and the court is otherwise unable to determine which interpretation is intended by the Legislature*."  *Oglesby v. State*, 441 Md. 673, 676 (2015) (emphasis added).  But the tools of statutory construction have not failed us here: the legislature intended to repeal the death penalty, *not* to create a right to jury sentencing in life without parole cases.

Our opinion in *Bellard* also rejected the other arguments that Mr. Shiflett raises here: that the absence of jury sentencing guidelines or restrictions on prosecutorial discretion rendered the life without parole sentencing process unconstitutionally vague, *Slip Op.* at 19 (citing *Woods v. State*, 315 Md. 591, 602-08 (1989)), and that the elimination of the death penalty elevated life without parole to the status of an "enhanced sentence" that requires proof of additional facts beyond a reasonable doubt.  *Id.* at 20-21 (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000)).  And again, to reach any of these conclusions we would need to hold, in the in the face of long-standing (and controlling) precedent to the contrary, that death was not, in fact, different, or that life without parole became "different" once the death penalty was repealed.

**C.    The Court Did Not Err In Excluding Evidence Of Mr. Shiflett's Psychological Profile.**

Mr. Shiflett argues *third* that the circuit court erred by refusing to let the defense introduce expert testimony describing his "psychological profile," a term he uses to describe the constellation of mental illnesses from which he claims he suffers.  In its case-in-chief, the State introduced threatening letters Mr. Shiflett had written to Ms. Hadel as

evidence of his premeditation and intent to kill her. Mr. Shiflett argues that he should have been allowed to rebut these with evidence of his psychological profile because, he believes, this evidence would have demonstrated that the letters were the product of his mental illness. And he contends that the testimony would have proven that he was unable to form the *mens rea* defined in CR § 2-201 for the charge of first-degree murder, that is, a deliberate, premeditated, and willful killing.

The State disputes the factual bases of Mr. Shiflett's proposed psychological profile testimony, but argues in any event that his obsession with Ms. Hadel had no bearing on whether he acted with premeditation and deliberation or his ability to form the specific intent to kill. The State characterizes the testimony as an effort by Mr. Shiflett to offer a "diminished capacity" defense, *i.e.*, that he was less capable than a normal person of forming the required *mens rea*, that is unavailable under Maryland law.

At a motions hearing on August 6, 2014, Mr. Shiflett offered testimony from Dr. Joanna Brandt, who diagnosed Mr. Shiflett with specified bipolar disorder, obsessive compulsive disorder, and borderline personality disorder:

> [T]he combination of illnesses is particularly malignant for him and is—are very impairing and have significant impact on his thinking and behavior. The first illness that I diagnosed was other specified bipolar disorder . . . .
>
> These symptoms that he has of elevated mood and expansive and irritable mood when—when he has a manic episode, decreased need for sleep, pressured speech, increased talkativeness, racing thoughts, distractibility, agitation and impulsivity, and he describes that he has felt like his head is exploding on numerous occasion. He also clearly has episodes of depressed mood where he has hypersomnia and sleeps a lot, low energy, poor concentration, feelings of worthlessness and

suicidal ideation. The records and his father corroborate that he has had these symptoms since childhood.

*      *      *

The second illness I diagnosed him with was obsessive compulsive disorder. This was diagnosed in him at age 7 or 8. Obsessions are recurrent and persistent thoughts, urges or images that are experienced as intrusive or unwanted and cased marked anxiety or distress. Individuals with obsessions attempt to ignore, suppress them or they attempt to neutralize them with a thought or action[,] that is by performing a compulsion which is a behavior. . . .

Compulsions are repetitive behaviors such as hand washing, ordering or counting or other mental acts or physical acts that the individual feels driven to perform in response to an obsession.

*      *      *

And to complicate matters further, he—he really has a severe permanent disorder which is characterized by borderline paranoid and antisocial traits. . . . He becomes extremely angry very quick. He—he had unstable interpersonal relationships. He's severely sensitive to being abandoned by others. He becomes very, very angry, and he acts in a very impulsive way. He has paranoid thoughts that are part of his personality.

Later, Dr. Brandt explained Mr. Shiflett's thought processes and the limitations on his ability to control himself:

So in—in anger and with increasing frustration, he threatened the victim for years. But at the same time, he was constantly thinking about trying to avoid acting on his impulse, and he was repeatedly failing at this. He tried to think of ways that he could get her to talk to him by threatening to bring civil action on her or have various agencies come in and stop her food stamps or get her husband in trouble. He wrote her letters saying, Please talk to me. He tried to contact her through Facebook, he had a friend call, and he—he recognized how out of control he was. He has for many years recognized this, but

31

> he *has that inability to stop himself and not act over and over
> again.*

(Emphasis added).

The court excluded Dr. Brandt's testimony after concluding that there was no nexus between Mr. Shiflett's psychological profile and the specific intent required to prove first-degree murder. The court compared this situation to those in *Hartless v. State*, 327 Md. 558 (1992) and *Bryant v. State*, 163 Md. App. 451 (2005), and found that the testimony lacked an adequate factual basis, and had no relevance to any material issue or defense in the case. The testimony, the court ruled, fell short of what Md. Rule 5-702 required for the admission of expert testimony and would only confuse the jury. We agree.

The State must prove every element of the crime beyond a reasonable doubt, including intent. Generally, therefore, defense evidence that could prove that the intent element of the crime did not exist, whether due to mental impairment or some other reason, is admissible. *Hoey v. State*, 311 Md. 473, 494 (1988). Mr. Shiflett sought here to demonstrate the absence of intent through expert testimony from a psychiatrist, and "[e]xpert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." Md. Rule 5-702. But expert testimony is admissible only if it is relevant, *i.e.*, "if the jury will find the testimony helpful in resolving the issues in the case." *Bryant*, 163 Md. App. at 473. And for expert testimony about Mr. Shiflett's psychological profile to be helpful to the jury in determining whether he formed the *mens rea* for first-degree murder, the testimony must bear a "rational nexus to the issues of premeditation

32

and intent." *Hartless*, 327 Md. at 577. Whether that rational nexus exists, and whether there is a sufficient factual basis to support the expert's testimony, is a matter committed to the sound discretion of the trial court, and a "court's action in admitting or excluding such testimony seldom constitutes grounds for reversal." *Bryant*, 163 Md. App. at 472.

Because psychiatrists are no more clairvoyant than any other witness, and lack the ability to reconstruct the emotions of a person at a specific time, they ordinarily are not competent to express an opinion as to the belief or intent a person harbored at a particular time. *Hartless*, 327 Md. at 573. A trial court *may* allow an expert to testify (as long as the testimony meets the requirements of Md. Rule 5-702) about a defendant's psychological profile if that testimony allows the jury to infer that the defendant was suffering from the symptoms of that psychiatric disorder on the date in question. *See Simmons v. State*, 313 Md. 33, 48 (1988), *Bryant v. State*, 163 Md. App. at 476. But as we see from the cases in which defendants have tried this approach before, there must be a direct connection between the fact and symptoms of the asserted mental illness and the specific mental state at issue—experts cannot simply identify an illness or symptom and opine generally on what the defendant might or might not have been able to do at the time.

On one hand, in *Simmons*, the defendant was accused of murder and, to support his defense of imperfect self-defense, sought to introduce testimony from a psychiatrist to confirm his subjective belief that he was in danger. 313 Md. at 48. The Court of Appeals concluded that the psychiatrist's testimony was "relevan[t] in that consistency between the specific subjective belief testified to by Simmons and Simmons's psychological profile tend[ed] to make it more likely that Simmons in fact held that subjective belief . . .," *id.* at

33

39, because it went directly to the defendant's claim of self-defense. In *Hartless*, on the other hand, the Court of Appeals affirmed a trial court's decision not to admit psychological profile testimony for a defendant who had stabbed and killed a clerk during the course of robbing a store because the testimony, which would have explained that the defendant "was under a tremendous amount of stress from his father," bore no rational nexus to the relevant issues of premeditation and intent. 327 Md. at 575. The Court noted that a psychological profile is admissible only if it carries significance beyond "a simple recitation of the defendant's background," that the profile had to explain how the defendant did not intend to commit murder, or how the murder was not deliberate and premediated, or else it would not be helpful to the jury. *Id.* at 575-77.

Finally, in *Bryant*, a defendant charged with the first-degree murder of his ex-wife sought to rebut the State's claim that the murder was premeditated with psychiatric testimony that he suffered from an impulse control disorder. 163 Md. App. at 463. We affirmed the trial court's decision not to admit that testimony,[8] noting the objective evidence that the defendant acted with premeditation by pacing near the victim's residence for hours, asking neighbors about who lived in the victim's residence, and cutting the phone cords in the victim's house, and that even with the disorder, the defendant was sometimes able to control his impulses. *Id.* Nothing connected his disorder to the criminal act itself: "The doctor's testimony would merely have presented evidence that appellant suffered

---

[8] We also held in *Bryant* that there could be no rational nexus between the proffered testimony and the particular facts of this case because the defendant denied ever committing the crime. *Id.* at 480-81.

34

from an impulse control disorder, which sometimes prevented him from controlling his aggressive impulses. There was simply no evidence that Ms. Martin's murder was the result of an impulsive act." *Id.* at 482.

This case and the testimony Mr. Shiflett sought to introduce are much more like *Hartless* and *Bryant* than *Simmons*. Dr. Brandt's testimony that Mr. Shiflett obsessed over Ms. Hadel, threatened her, acted with an intent to evoke a response from her, and had difficulty controlling his impulses would have borne no rational nexus to his ability to plan and carry out Ms. Hadel's murder. To the contrary, Dr. Brandt conceded that Mr. Shiflett had thought about killing Ms. Hadel for years, but had managed to avoid acting on that impulse in the past. She also would have offered no evidentiary basis to support Mr. Shiflett's claim that his mental illnesses prevented him from premeditating Ms. Hadel's murder. And as in *Bryant*, the evidence demonstrates that the murder was deliberate and premeditated: Mr. Shiflett *walked* from Annapolis to Reisterstown, staked out Ms. Hadel's apartment for two full days, then waited until her husband was gone before he killed her. Without some direct connection between Mr. Shiflett's disorders and his ability to plan and carry out this murder, Dr. Brandt's testimony would have invited the jury to speculate about what was or wasn't in his mind at the time, and was therefore properly excluded.

### D.     Mr. Shiflett Was Competent To Stand Trial.

*Fourth*, Mr. Shiflett argues that the circuit court erred in finding him competent to stand trial. At the conclusion of the third day of trial, the court ordered a competency evaluation in response to Mr. Shiflett's request to discharge his counsel. Over the next two days, the court heard testimony from Doctors Stephen Siebert, Christiane Tellefsen, and

Joanna Brandt; Dr. Siebert[9] and Dr. Tellefsen ultimately concluded that Mr. Shiflett was competent, and Dr. Brandt testified that he was not. After hearing all the testimony, the court ruled Mr. Shiflett competent:

> I find that not only does he understand the nature and object of the proceeding, but that he is absolutely able to assist in his defense, has assisted in his defense, shows a high level of insight into the nature of the case, the witnesses presented. And although he has shown a—a dissatisfaction with counsel . . . that is not the standard. And this Court feels that h[e] is able to control his actions when it suits him, and understands how this case is proceeding and can assist in his defense.

A criminal defendant has a Fourteenth Amendment Due Process right not to be tried while incompetent, and this prohibition "is fundamental to an adversary system of justice." *Sibug v. State*, 445 Md. 265, 301 (2015) (quoting *Drope v. Missouri*, 420 U.S. 167, 172 (1975)). A defendant is incompetent if he or she is unable to understand the nature or object of the proceeding, or to assist in [his or her] defense. Md. Code (2001, 2008 Repl. Vol.), § 3-101(f) of the Criminal Procedure Article ("CP"); *Thanos v. State*, 330 Md. 77, 84-85 (1993). If the defendant's competency is in doubt, whether the question is raised by counsel or the court decides to pursue the matter *sua sponte*, the court must conduct a hearing to determine "whether [the accused] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and whether he has a rational

---

[9] In his initial testimony, offered September 18, 2014, Dr. Siebert concluded that Mr. Shiflett was not competent and would be unable to follow the proceedings or meaningfully answer questions, citing his concern that Mr. Shiflett was unable to explain what he was charged with during his competency evaluation. However, after reviewing video recordings of Mr. Shiflett at the detention center and listening to recorded telephone conversations between Mr. Shiflett and his father, Dr. Siebert changed his opinion and testified that he believed Mr. Shiflett was competent.

36

as well as factual understanding of the proceedings against him." *Sibug*, 445 Md. at 300-01 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

A court may consider competency at any time before or during trial, and *must* undertake a competency review if the defendant appears to be incompetent or alleges incompetence. *Peaks v. State*, 419 Md. 239, 252 (2011). The court starts with a presumption of competence and must determine, based on the record, that the defendant is competent to stand trial beyond a reasonable doubt. *Id.* at 251-52; CP § 3-104(a). The inquiry is highly fact-specific, and we review competency decisions for clear error. *Id.* at 252.

Mr. Shiflett contends that the court's conclusion that he was competent, which rested on Mr. Shiflett's alleged ability to control his actions, was not supported by the doctors' testimony. We disagree, and find that the doctors' testimony provided ample evidence to support the court's conclusion. For example, Dr. Tellefsen testified that Mr. Shiflett not only was competent, but had a fairly sophisticated level of knowledge about the trial and the defenses available to him. In her opinion, Mr. Shiflett could control his behavior, particularly when he believed it was to his advantage to do so, and his disruptive behavior in the court room flowed from his desire to "impress everyone that he's mentally ill." Similarly, Dr. Siebert concluded that Mr. Shiflett was competent to stand trial, notwithstanding his erratic behavior, after listening to a recorded phone call between Mr. Shiflett and his father after the first day of trial in which Mr. Shiflett made specific statements about his capacity to regulate his own behavior:

> For example, he said that he—if anybody tried to put a shock bracelet on him, that he was going to swing on them. He even said that he told the—the sheriffs that . . . I have been giving none of you problems up at this—up to this point, but if they try to put that shock bracelet on—on me, I will swing at them.
>
> At the very end of the phone call he said to the father, he said the following: I have been giving them a raft of hell and they know it. And I believe he was referring to the—this trial. In other words, I—I believe that he was referring in that telephone call to the fact that . . . his disruptive behavior has been disruptive to the flow of this criminal trial up to the present time.

Mr. Shiflett responds by pointing to Dr. Brandt's findings that he was unable to control his behavior when agitated, and would be unable to testify in his own defense in a relevant manner. He attacks Dr. Tellefsen's conclusions, saying that she conceded he was out of control at times and unable to communicate with his attorney, and argues that Dr. Siebert was wrong to rely on a phone call he made the first day of trial because his mental state deteriorated as the trial went on. But although the experts reached conflicting conclusions, the standard doesn't require unanimity, and the trial court's finding that Mr. Shiflett was competent was supported by ample evidence. Both Dr. Tellefsen and Dr. Siebert concluded that Mr. Shiflett was, for the most part, able to control his behavior, and demonstrated a sophisticated understanding of the proceedings against him and his defenses, and both doctors found that Mr. Shiflett was aware that emphasizing his mental illness would work to his advantage. "Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder," *Pinkney*, 151 Md. App.

at 326 (quoting *State v. Stanley*, 351 Md. 733, 750 (1998)), and we see no error in the court's decision to credit Dr. Tellefsen's and Dr. Siebert's conclusions over Dr. Brandt's.

### E.  The Burglary Charge Is Not Duplicative.

*Finally,* Mr. Shiflett argues that the circuit court erred by refusing to dismiss his first-degree burglary charge.  Count Three of Mr. Shiflett's indictment alleged that:

> on or about 2/5/2013, in Baltimore County, did unlawfully break and enter the dwelling of Katie Ann Hadel-Gordon, located at [victim's address], in violation of Criminal Law Article 6-202 of the Annotated Code of Maryland; against the peace government and dignity of the State.

A person commits first degree burglary under CR § 6-202 by "break[ing] and enter[ing] the dwelling of another with the intent to commit theft *or* a crime of violence." (Emphasis added.)  Mr. Shiflett appears to argue that the indictment, by simply referencing CR § 6-202 rather than specifying whether the alleged burglary was committed with the intent to commit theft or the intent to commit a crime of violence, in effect charges him with more than one substantive offense in a single count.  The State counters that the language in the indictment tracks precisely the language of CR § 6-210, which provides that a charging document for burglary is sufficient "if it substantially states: '(name of defendant) on (date) in (county) did break and enter (describe property) or (describe other crime) in violation of (section violated) against the peace, government, and dignity of the State.'"  We agree with the State.

The charging document is meant to fulfill the constitutional requirement of Article 21 of the Declaration of Rights that each person charged with a crime have notice of the accusations.  *Jones v. State*, 303 Md. 323, 336 (1985).  Thus, the charging document must

39

allege the essential elements of the offense charged, and only one offense may be charged in a single count. *Ayre v. State*, 21 Md. App. 61, 64 (1974). Mr. Shiflett points to *Thanos v. State*, in which the Court of Appeals held that when a statute forbids several separate actions and states those actions disjunctively—with an "or"—simply referring to the statute in a single count of the indictment to allege that the defendant committed one of those actions "will be defective as indefinite, since the disjunctive renders it uncertain which alternative is intended." 282 Md. at 716-17. In *Thanos*, the State prosecuted a shoplifter, and the charging document stated that she had removed the tag from a garment for sale in a Towson department store. *Id.* at 710. The court explained that had the charging document duplicated the language of the shoplifting statute exactly, and charged the defendant with "alter[ing], remov[ing], *or* otherwise disfigur[ing] a price tag," rather than removal, it would have been defective for uncertainty. *Id.* at 717 (internal quotations omitted) (emphasis added).

Since *Thanos*, however, both this Court and the Court of Appeals have confirmed that the charging document need not set forth all essential elements of the crime, and that some elements may be implied. *Jones*, 303 Md. at 337. For example, in *Whitehead v. State*, this Court found that the simply citing the statute number was essentially "incorporation by reference," having the same effect as if the text of the statute had been set forth in full. 54 Md. App. 428, 445 (1983). Thus, we held that the language of an indictment was not duplicitous when it charged the defendant with theft "in violation of Art. 27, § 342 of the Annotated Code of Maryland." *Id.* at 441. Although the statute listed, in the disjunctive, five different ways in which the crime of theft can be perpetrated, we

found that the reference to theft by using the short form § 342 in effect charged the defendant *conjunctively* with any or all of the five methods. *Id.* at 442; *see also Jones*, 303 Md. at 338 (confirming that the Court of Appeals "share[s] the views so well expressed in *Whitehead*").

By citing to CR § 6-202, the indictment charged Mr. Shiflett with committing burglary by "any or all" of the requisite intents listed. The State volunteered, at a hearing five months prior to trial, that it would proceed on the theory that Mr. Shiflett broke into the victim's home with the intent to commit a crime of violence. If Mr. Shiflett required more notice of what he was being charged with, he could have requested a bill of particulars, but he didn't, nor does he dispute that the indictment complied with the language required by CR § 6-210.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**